767 A.2d 962

JEFFREY SCHICK, PLAINTIFF–RESPONDENT, v. JOHN
FEROLITO, DEFENDANT–APPELLANT.

Argued November 27, 2000—Decided March 12, 2001.

James M. DeMarzo argued the cause for appellant (*O'Donnell, McCord, Helfrich & DeMarzo*, attorneys).

*Richard M. Chisholm* argued the cause for respondent.

The opinion of the Court was delivered by

LaVECCHIA, J.

On July 27, 1994, two pairs of golfers reached the tenth hole of East Orange Golf Course and agreed there to play the rest of the course as a foursome. Plaintiff Jeffrey Schick and his father, Wolfgang Schick, played the ensuing holes with defendant John Ferolito and Tom Ganella. At the tee-box on the sixteenth hole, a par four straightaway approximately 300 yards in length, an errant ball hit off the tee by defendant struck plaintiff in the right eye causing personal injuries. According to plaintiff, defendant hit an unannounced and unexpected second tee shot, or "mulligan," after all members of the foursome had teed off. Defendant moved for summary judgment, claiming that the heightened standard of care established by *Crawn v. Campo*, 136 *N.J.* 494, 643 *A.*2d 600 (1994), should apply to participants in the game of golf. That duty of care is "to avoid the infliction of injury caused by reckless or intentional conduct." *Id.* at 497, 643 *A.*2d 600.

The trial court agreed that a recklessness standard applied and dismissed the action. The Appellate Division reversed, holding that the case was distinguishable from *Crawn* and that the negligence standard of care was applicable. *Schick v. Ferolito*, 327 *N.J.Super.* 530, 744 *A.*2d 219 (App.Div.2000). The panel reasoned that the recklessness standard was appropriate in "rough and tumble" sports, where " 'anticipated risks ... are an inherent or integral part of the game.' " *Id.* at 533–34, 744 *A.*2d 219 (quoting *Crawn, supra,* 136 *N.J.* at 504, 643 *A.*2d 600). As for golf, the court stated that the heightened standard would be appropriate only for anticipated risks of the game, such as errant or shanked balls, but not for unanticipated risks, such as an "unexpected Mulligan" as occurred here. *Id.* at 534, 744 *A.*2d 219. Because *Crawn* may have left open the question of whether the recklessness standard should apply generally to conduct in recreational

sporting contexts, including golf, we granted certification. 164 *N.J.* 191, 752 *A.*2d 1293 (2000).

## I.

The facts presented through deposition testimony were disputed in several critical aspects. For purposes of our review, we give plaintiff the benefit of all reasonable inferences. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

According to plaintiff, he and his father met defendant and Ganella at the tenth tee and the four decided to play as a group, which would speed up play. It was dusk, and there were nine holes remaining to play. They played without incident until the sixteenth hole. There, plaintiff and his father teed off first. He and his father then left the tee-box area, returned to their golf cart, placed their clubs in their golf bags, and proceeded to sit down in the cart. Plaintiff described his cart as located ahead of the tee-box area at a forty-five-degree angle to the left.

Seated in the driver's position, plaintiff looked back over his right shoulder toward the teeing area and observed defendant about to strike a ball off the tee. Plaintiff claims that defendant and Ganella already had hit their tee shots and that defendant was hitting an unannounced second drive off the tee. Plaintiff stated that defendant's first ball had sliced, or angled sharply, off to the right, toward a series of trees situated along the right side of the fairway, but in an area where no out-of-bounds markers were located. Thus, while it might have presented a poor location for his next shot, defendant's first ball was still "in-play."

Although he saw defendant in a tee-off stance, plaintiff said he did not have time to move out of the way. He had only a few seconds to think about what was happening when defendant commenced his swing and hit his second tee shot. The ball struck plaintiff in the right eye socket, rendering him temporarily unconscious.

Defendant gives a different version of what transpired. He did not recall if it was his first or second shot off the tee. Defendant claims that he and plaintiff made eye contact before defendant teed off and that he gave a hand warning, described as a "wave," to plaintiff to move aside. According to defendant, plaintiff's cart was approximately thirty feet ahead, at a forty-five-degree angle, of where he was taking his stance to drive the ball onto the fairway. Defendant states he was trying to hit the ball straight down the middle of the fairway, and plaintiff similarly testified that defendant was not trying to hit in plaintiff's direction. Nevertheless, defendant explained that he waved plaintiff to move aside because defendant believed plaintiff "was in the line of fire."

Ganella's deposition testimony indicated that he did not recall defendant taking a tee shot other than the one that struck plaintiff. Ganella could not even recall if he had teed off on the sixteenth hole, suggesting that plaintiff and his father returned to their cart before the two other men had hit their drives. He stated that on previous holes plaintiff and his father had been returning to their cart before all members of the foursome had teed off. Ganella perceived the timing of the events differently than plaintiff. Specifically, Ganella described a span of approximately one to two minutes between the time defendant motioned to plaintiff that he was about to hit and the time defendant actually struck the ball.

## II.

In *Crawn*, the Court considered the nature of a sports participant's duty to avoid inflicting physical injury on another player. *Crawn, supra,* 136 *N.J.* at 497, 643 *A.*2d 600. In that case, a catcher suffered an injury when a base runner slid into home plate during an informal softball game. *Id.* at 498, 643 *A.*2d 600. Our holding in *Crawn* was stated broadly. "[T]he duty of care applicable to participants in informal recreational sports is to avoid the infliction of injury caused by reckless or intentional conduct." *Id.* at 497, 643 *A.*2d 600. Two important considerations supported the

decision to apply a standard of care that exceeded negligence: the promotion of vigorous participation in athletic activities, and the avoidance of a flood of litigation generated by participation in recreational games and sports. *Id.* at 501, 643 *A.*2d 600. The Court determined that those policies outweighed concerns that raising the standard of care implicitly immunized conduct that otherwise would be considered tortious and actionable. *Id.* at 502, 643 *A.*2d 600.

In applying the recklessness standard, the Court sought to avoid the complexities inherent in applying a negligence standard to conduct in recreational sports. *Id.* at 507–08, 643 *A.*2d 600. The Court reasoned that in that context, "a legal duty of care based on the standard of what, objectively, an average reasonable person would do under the circumstances is illusory, and is not susceptible to sound and consistent application on a case-by-case basis." *Ibid.* Ascertaining whether a participant acted so as to create a risk of harm that was not a normal or ordinary part of the game is a difficult task. *Id.* at 506, 643 *A.*2d 600. The Court explained further:

> Our conclusion that a recklessness standard is the appropriate one to apply in the sports context is founded on more than a concern for a court's ability to discern adequately what constitutes reasonable conduct under the highly varied circumstances of informal sports activity. The heightened standard will more likely result in affixing liability for conduct that is clearly unreasonable and unacceptable from the perspective of those engaged in the sport yet leaving free from the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be "part of the game."

> One might well conclude that something is terribly wrong with a society in which the most commonly-accepted aspects of play—a traditional source of a community's conviviality and cohesion—spurs litigation. The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms.

> [*Id.* at 508, 643 *A.*2d 600.]

The Court's holding in *Crawn* placed New Jersey among the majority of jurisdictions that apply the recklessness standard of care to determine the duty that recreational players owe to one another. *See, e.g., Knight v. Jewett,* 3 *Cal.*4th 296, 11 *Cal.Rptr.*2d

2, 834 *P.*2d 696 (1992) (applying recklessness standard to injury in touch football); *Picou v. Hartford Ins. Co.*, 558 *So.*2d 787 (La.Ct. App.1990) (holding recklessness applies to injuries sustained in informal softball game); *Ritchie–Gamester v. City of Berkley*, 461 *Mich.* 73, 597 *N.W.*2d 517 (1999) (applying recklessness standard to ice skating collision); *Dotzler v. Tuttle*, 234 *Neb.* 176, 449 *N.W.*2d 774 (1990) (applying recklessness to pick-up basketball game); *Connell v. Payne*, 814 *S.W.*2d 486 (Tex.App.1991) (applying recklessness standard to injury in polo match); *see also* Daniel E. Lazaroff, *Torts & Sports: Participant Liability to Co–Participants for Injuries Sustained During Competition*, 7 *U. Miami Ent. & Sports L.Rev.* 191, 195, 198 (1990) (finding that recklessness standard of care is the "modern trend").

Since *Crawn*, the recklessness standard of care has been applied in New Jersey to sporting environments that span team competitions, one-on-one competitions, and individualized sporting endeavors. *See, e.g., Obert v. Baratta*, 321 *N.J.Super.* 356, 729 *A.2d* 50 (App.Div.1999) (applying recklessness standard when softball player sued teammate for injuries sustained as result of teammate's pursuit of fly ball during informal intra-office game); *Rosania v. Carmona*, 308 *N.J.Super.* 365, 706 *A.2d* 191 (App.Div.) (applying reckless standard where karate student brought action against martial arts academy and instructor, seeking damages for retinal detachment suffered during karate proficiency test match with instructor), *certif. denied*, 154 *N.J.* 609, 713 *A.2d* 500 (1998); *Calhanas v. South Amboy Roller Rink*, 292 *N.J.Super.* 513, 679 *A.2d* 185 (App.Div.1996) (applying recklessness standard where roller skater suffered broken leg from collision with another skater). In this matter, the trial court concluded that the heightened standard of recklessness or intentional conduct should apply also to participants in the game of golf.

Several other jurisdictions have applied the heightened standard of care in the context of the game of golf. The Ohio Supreme Court was the first court to so extend the reckless disregard or intentional conduct standard to a "noncontact sport." *Thompson*

*v. McNeill,* 53 *Ohio St.*3d 102, 559 *N.E.*2d 705 (1990). In *Thompson,* the defendant inadvertently shanked a golf ball in the direction of the plaintiff, who was playing in her foursome. *Id.* at 709. Despite the defendant's alleged effort to yell "fore," the plaintiff was struck by the ball and was injured. The court held that the danger of such an occurrence was an inherent part of the game and granted summary judgment for defendant. *Ibid.* In analyzing the facts under a reckless or intentional conduct standard of care, the court noted that the plaintiff was off to the defendant's right at such a sharp angle that she was not within the intended flight of defendant's ball. *Ibid.* Also, the defendant's shot was taken in accordance with the rules of golf; it was not a prohibited shot exposing the plaintiff to more danger than that which any golfer faces when participating in a round of golf. *Ibid.* The court stated:

> Shanking the ball is a foreseeable and not uncommon occurrence in the game of golf. The same is true of hooking, slicing, pushing, or pulling a golf shot. We would stress that "[i]t is well known that not every shot played by a golfer goes to the point where he intends it to go. If such were the case, every player would be perfect and the whole pleasure of the sport would be lost. It is common knowledge, at least among players, that many bad shots must result although every stroke is delivered with the best possible intention and without any negligence whatsoever."
>
> [*Ibid.* (quoting *Benjamin v. Nernberg,* 102 *Pa.Super.* 471, 475–76, 157 *A.* 10 (1931)).]

California also applies the recklessness standard of care to golf. In *Dilger v. Moyles,* 54 *Cal.App.*4th 1452, 63 *Cal.Rptr.*2d 591 (1997), the California Court of Appeal held that a participant in golf owes no duty to co-participants unless he or she intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport. The court reasoned that participants assume those risks of injury inherent in the sport. *Id.* at 593. Even a rule violation, in and of itself, is not sufficient to meet that heightened standard, as the court stated:

> [E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by

deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule.

[*Ibid.* (quoting *Knight, supra,* 11 *Cal.Rptr.*2d 2, 834 *P.*2d at 696).]

The court reasoned that a lower standard of care could deter people from participating in golf and cause them to forego the benefits of the sport, such as exercise and socialization. *Ibid.*

Similarly, the Texas courts apply the recklessness standard to golf. *See Allen v. Donath,* 875 *S.W.*2d 438, 440 (Tex.App.1994) (applying reckless or intentional conduct standard in evaluating conduct of golfer whose second tee shot caused injury to co-participant); *Hathaway v. Tascosa Country Club, Inc.,* 846 *S.W.*2d 614, 616 (Tex.App.1993) (applying recklessness and intentional standard rather than ordinary negligence to cause of action arising out of injury resulting when golfer's ball struck another golfer). The facts in *Allen* are notably similar to this case. The defendant was the first of a threesome to tee off on the third hole. *Allen, supra,* 875 *S.W.*2d at 439. As the defendant teed off from the furthest back blue, or "professional," tee-box area, the two other golfers watched from a golf cart situated near a white tee-box marker further forward, approximately fifteen to twenty feet ahead of defendant. *Ibid.* After watching the defendant hit his tee shot, the plaintiff and the other player turned away from the defendant and moved to the back of their cart. The plaintiff then heard a club hit a ball, turned toward the defendant, and was struck in the left temple. *Ibid.* Whether the defendant warned of his second shot was a disputed fact. *Ibid.* The case proceeded to trial.

The jury was instructed that the defendant was under a duty not to act recklessly or to intend to cause injury. The plaintiff's objection to the heightened charge was overruled, and the jury returned a verdict for defendant. *Ibid.* On appeal, the plaintiff contended that the recklessness standard should apply only to errant or shanked balls, not to second unannounced shots, because the latter are not foreseeable in the game of golf. *Id.* at 440. The court disagreed and found that the jury was instructed properly concerning the recklessness standard. Implicit in the court's

ruling was that the jury was free to find that the defendant acted recklessly when considering whether he hit a second unannounced tee shot in violation of the game's custom when the plaintiff was standing unprotected forward of the defendant's tee-box location. *Ibid.*

Many legal commentators have written to support the use of the recklessness standard in the context of all sporting activities. *See* Brendon D. Miller, *Hoke v. Cullinan: Recklessness as the Standard for Recreational Sports Injuries,* 23 *Ky. L.J.,* 409, 434 (1996) (supporting Kentucky Supreme Court's decision to apply recklessness standard to all sports activities; and stating that that decision allows participants in recreational sporting activities to perform with utmost intensity without apprehension that any wrong move could spawn liability, quelling competitive juices and enjoyment along the way); Mel Narol, *Sports Participation with Limited Litigation: The Emerging Reckless Disregard Standard,* 1 *Seton Hall J. Sport L.* 29 (1991) (concluding reckless disregard standard is correct approach for courts to take in deciding when and in what manner to become involved in sports injury litigation); Frank J. Deangelis, Note, *Duty of Care Applicable to Participants in Informal Recreational Sports to Avoid the Infliction of Injury Caused by Reckless or Intentional Conduct,* 5 *Seton Hall J. Sport L.* 509 (1995) (concluding that correct standard, as adopted by majority of courts, is recklessness). Two articles specifically have called on courts to apply the recklessness standard to golf. *See* Melissa Cohen, Note, *Co–Participants in Recreational Activities Owe Each Other a Duty not to Act Recklessly,* 10 *Seton Hall J. Sport. L.* 187 (2000); Karen M. Viera, Comment, *'Fore!' May Just be Par for the Course,* 4 *Seton Hall J. Sport L.* 181 (1994). Those authors argue that even if golf is considered a noncontact sport, it entails inherent risks that pose a potential for danger. Different standards applied to different sports would lead to confusion among potential litigants. Cohen, *supra,* 10 *Seton Hall J. Sport L.* at 202.

■ The policies of promotion of vigorous participation in recreational sports and the avoidance of a flood of litigation over sports accidents are furthered by the application of the heightened standard of care to all recreational sports. We perceive no persuasive reason to apply an artificial distinction between "contact" and "noncontact" sports. In fact, only a minority of courts do so. *See LaVine v. Clear Creek Skiing Corp.*, 557 *F.*2d 730 (10th Cir.1977) (applying negligence standard in skiing context); *Gray v. Houlton*, 671 *P.*2d 443 (Colo.Ct.App.1983) (applying negligence standard to skiing accident); *Novak v. Virene*, 224 *Ill. App.*3d 317, 166 *Ill.Dec.* 620, 586 *N.E.*2d 578 (1991) (applying negligence standard in skiing context); *Duke's GMC, Inc. v. Erskine*, 447 *N.E.*2d 1118 (Ind.Ct.App.1983) (applying negligence standard in golf context). We find that distinction contrary to the common sense notion that risk of injury is a "common and inherent aspect" of athletic effort generally. *Crawn, supra,* 136 *N.J.* at 500, 643 *A.*2d 600. The risk arises in myriad forms and for many reasons. It may arise from the physical nature of the athletic endeavor creating the possibility, or likelihood, of direct physical contact with another player or with a ball thrown or hit among players. Risk of injury also is as real when it arises from an instrumentality used in a game, such as a golf club a golfer swings or the small hard ball the club propels at a very high rate of speed. Even for an experienced golfer of some proficiency, the course a golf ball takes is often unpredictable through no conscious fault of the golfer. The Ohio Supreme Court acknowledged in *Thompson* that recreational sports entail a range of duties and risks of harm:

> [T]he contact-non-contact distinction does not sufficiently take into account that we are dealing with a spectrum of duties and risks rather than an either-or distinction. Is golf a contact sport? Obviously a golfer accepts the risks of coming in contact with wayward golf shots on the links, so golf is more dangerous than table tennis, for instance, but certainly not as dangerous as kickboxing.
>
> [*Thompson, supra,* 559 *N.E.*2d at 709.]

■ The applicability of the heightened standard of care for causes of action for personal injuries occurring in recreational sports should not depend on which sport is involved and whether it

is commonly perceived as a "contact" or "noncontact" sport. The recklessness or intentional conduct standard of care articulated in *Crawn* was not meant to be applied in a crabbed fashion. That standard represented the enunciation of a more modern approach to our common law in actions for personal injuries that generally occur during recreational sporting activities. It is the pertinent standard for assessing the duty of one sports participant to another concerning conduct on golf courses and tennis courts, as well as conduct on basketball courts and ice rinks.

## III.

Application of a recklessness or intentional conduct standard to a cause of action involving a golfing injury should not convert a golf course into a free-fire zone. But application of a recklessness standard in a golf setting will affect the analysis of the probability of harm and the defendant's indifference to that harm. The question presented here is whether plaintiff's case can survive a summary judgment motion under a recklessness standard. Prosser & Keeton have stated that an actor acts recklessly when he or she intentionally commits an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. *Prosser & Keeton on the Law of Torts*, § 34 at 212 (5th Ed.1984). The standard is objective and may be proven by showing that a defendant "proceeded in disregard of a high and excessive degree of danger either known to him [or her] or apparent to a reasonable person in his [or her] position." *Id.* at 214. Reckless conduct is an extreme departure from ordinary care, in a situation in which a high degree of danger is apparent. *Ibid.* Reckless behavior must be more than any "mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention...." *Ibid.*

The Restatement (Second) of Torts articulates the standard as follows, contrasting negligence and recklessness:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
>
> [*Restatement (Second) of Torts* § 500 at 587 (1965).]

Recklessness, unlike negligence, requires a conscious choice of a course of action, with knowledge or a reason to know that it will create serious danger to others. Negligence may consist of an intentional act done with knowledge that it creates a risk of danger to others, but recklessness requires a substantially higher risk. The quantum of risk is the important factor. *Ibid.*

Application of that standard to this matter requires an analysis of whether a finding of recklessness would be open to the jury. If so, summary judgment rightfully was denied defendant and the matter should proceed to trial. As was the case in *Allen,* we find that this case presents a question of recklessness that is properly for a jury to determine.

The facts are in conflict, but they are open to an interpretation that defendant did hit a second shot off the tee without telling the others in his playing group that he was about to do so. That version of the facts explains the so-called "mulligan" reference by the Appellate Division. Defendant's conduct in that respect is certainly relevant, but of itself is not determinative of the quality of his act. Although the formal rules of golf do not recognize the term "mulligan," informal custom may permit that familiar "do-over." And the formal rules of the game allow for the taking of a second, or "provisional shot," if certain conditions are met. United States Golf Ass'n, *The Rules of Golf* Rule 27.2. Provisional Ball, at 73–74 (2000–01). The rules prescribe a strict form of notice to one's playing partners of intent to take a provisional shot. *Id.* at 73. Decisions on the Rules of Golf prescribe that the player must inform his opponent or fellow

player that he intends to play a provisional ball and he must mention the words "provisional ball." United States Golf Ass'n, *Decisions on the Rules of Golf* 27–2a/1, at 458 (2000–01). The following statements have been ruled not to satisfy the requirement of announcing a provisional ball: "That might be lost, I am going to re-load." "I'd better hit another one." "That might be out of here." *Id.* at 459. As a practical matter, technical compliance with the rules at times may be lax on the course, but that should not compel a determination of recklessness. It is but one factor in the totality of circumstances to be examined in the context of a defendant's motion for summary judgment under a recklessness standard of care in a recreational sports context.

What does bear emphasis in this matter is defendant's own testimony that he perceived plaintiff to be in the "line of fire" and that he waved plaintiff off in an effort to induce plaintiff to move from his location. Plaintiff did not move, or defendant did not wait for him to move, and defendant hit anyway. That scenario presents a set of facts that a jury could find constitutes reckless conduct because it may reflect a conscious choice of a course of action with knowledge or reason to know that the action will create serious danger to others.

The dissent emphasizes the need for stringent application of the recklessness standard of care in a golf setting, or in the context of other recreational sports, in order to isolate truly "egregious" conduct on the part of fellow sports participants (op. at 18, 767 A.2d at 968). On that we do not disagree. But, in this instance the dissent narrowly focuses only on the nature of defendant's shot when applying that standard. That approach does not appreciate the totality of defendant's conduct leading up to the striking of that errant shot. This case is not one reconciled on a motion for summary judgment under a recklessness standard of care on the simple basis of an unannounced "mulligan" or on the sole basis that defendant hit a "shanked" shot. Rather, a jury must assess a combination of alleged events in which defendant, believing plaintiff to be located "in his line of fire" thirty feet ahead of the tee-

box where defendant stood and to the left at an angle of forty-five degrees, motioned plaintiff to move away from his present location, and knowing that plaintiff had not moved, proceeded to hit the tee shot anyway. True, it was an errant tee shot, but that does not excuse defendant's conduct because it does not fully address the question of whether the totality of defendant's action passes muster under a recklessness standard of care.

We conclude that plaintiff's case, even analyzed under a recklessness standard of care, survives defendant's motion for summary judgment and should proceed to trial. The facts here more persuasively present a jury question concerning recklessness than did the facts in *Allen, supra,* 875 *S.W.*2d 438. There, the defendant had not testified in deposition that he perceived the plaintiff to be in his "line of fire" and that he had motioned to or warned the plaintiff to move away from that danger.

▇ In conclusion, we hold that the recklessness or intentional conduct standard of care applies generally to conduct in recreational sporting contexts, including golf. Notwithstanding that holding, this matter must proceed to trial. Properly instructed on the heightened standard of care, a jury must resolve the disputed facts that encompass allegations of reckless conduct by defendant.

### IV.

The judgment of the Appellate Division is affirmed, as modified. The matter is remanded to the Law Division for trial.

VERNIERO, J., concurring in part, dissenting in part.

I concur in that part of the Court's opinion adopting the recklessness standard in recreational sporting contexts, including golf. The Court's analysis in that regard is persuasive. I respectfully dissent, however, from the majority's determination that there are disputed material facts warranting a trial in this case. Only the most egregious acts of golfers should give rise to liability in this setting. Because that standard has not been satisfied here,

I would reverse the judgment of the Appellate Division and reinstate the trial court's summary disposition in favor of defendant.

## I.

The Court correctly holds that defendant's conduct should be measured against a recklessness standard. I part company from my colleagues because existing case law supports a finding that defendant's conduct was not so egregious as to violate the heightened standard of care described by the majority. Unlike the majority, I find no issues for the jury.

Implicit in the recklessness standard is a requirement that a defendant's conduct be egregious. In *Obert v. Baratta,* 321 *N.J.Super.* 356, 358, 729 *A.*2d 50 (App.Div.1999), the plaintiff was injured when she and the defendant, a fellow outfielder in an informal softball game, collided as they both tried to catch a fly ball. The trial court granted summary judgment in favor of the defendant. *Id.* at 357, 729 *A.*2d 50. The Appellate Division affirmed. *Id.* at 359, 729 *A.*2d 50. The panel explained that the defendant's attempt to catch the fly ball constituted no more than ordinary negligence and did not violate the heightened recklessness standard. *Ibid.*

Importantly, the Appellate Division reasoned that the defendant's conduct "was not the kind of *egregiously reckless conduct* that merits a departure from the strong public policy encouraging vigorous participation in the 'rough-and-tumble of sports' activity freely, without fear of being 'second-guessed in courtrooms.'" *Id.* at 360, 729 *A.*2d 50 (quoting *Crawn v. Campo,* 136 *N.J.* 494, 508, 643 *A.*2d 600 (1994)) (emphasis added).

Decisions involving golf from other jurisdictions support a finding that defendant here was not reckless as a matter of law. In *Gray v. Giroux,* 49 *Mass.App.Ct.* 436, 730 *N.E.*2d 338, 339, *review denied,* 432 *Mass.* 1106, —— *N.E.*2d —— (2000), the plaintiff and her husband were playing golf with the defendant and his wife. At the "dogleg" ninth hole (a dogleg is a hole in which the fairway

bends in one direction), the plaintiff's husband hit his shot into the woods to the left of the fairway. *Ibid.* The plaintiff stood on the left side of the fairway near the woods, approximately thirty-five to fifty yards in front of the defendant. *Id.* at 339–40. The defendant took his next shot without warning the plaintiff, and the ball struck the plaintiff in the head. *Id.* at 340. The trial court granted summary judgment in favor of the defendant. *Id.* at 339.

The appellate court held that the recklessness standard of conduct was appropriate, and affirmed the lower court's summary disposition. *Id.* at 340–41. The court explained that because the hole was a dogleg to the right, and the plaintiff and the defendant were standing on the left side of the fairway, the defendant was not aiming his shot toward the plaintiff; rather, the defendant was trying to hit his ball onto the green to his right. *Id.* at 341. Accordingly, the court found that the plaintiff was not in the intended line of flight of the defendant's shot. *Ibid.* The court ruled that "[i]n these circumstances, the fact that the defendant's shot did not follow its intended path does not amount to wilful, wanton, or reckless conduct." *Ibid.*

Similarly, other courts have found that a golfer is not reckless simply because he or she "shanks" a shot that happens to hit a fellow golfer. In *Monk v. Phillips*, 983 *S.W.*2d 323, 323–24 (Tex.App.1998), the plaintiffs (husband and wife), the defendant, and another golfer were playing as a foursome. At the second hole, the defendant's first ball traveled into the trees to the right of the fairway. *Id.* at 324. The defendant took a second tee shot, which landed in the rough to the right of the fairway near his first shot. *Ibid.*

The defendant proceeded to his second ball and decided to play that shot. *Ibid.* As the defendant was standing near his ball, one of the plaintiffs and the fourth member of the group passed in front of the defendant and went to the defendant's right to search for the defendant's first ball. *Ibid.* As he was about to hit, the defendant heard someone say, " 'look out, he's fixing to hit[,]' " but no one asked the defendant to stop. *Ibid.* Although the defen-

dant "was aiming to shoot the ball straight," the ball traveled at a ninety-degree angle to his right, striking one of the plaintiffs in the eye. *Id.* at 325.

The trial court granted the defendant's motion for summary judgment. *Id.* at 323. Affirming the lower court, the appellate court noted that although the defendant's "conduct may qualify as incompetence or unskillfulness, we find as a matter of law that it does not rise to the level of recklessness. Shanking the ball is a foreseeable and not uncommon occurrence in the game of golf that all golf players must accept." *Id.* at 325.

*Hathaway v. Tascosa Country Club, Inc.,* 846 *S.W.*2d 614 (Tex.App.1993), is also instructive. There, the defendant was practicing his golf stroke on the course's driving range. *Id.* at 615. The defendant was hitting balls from the left side of the range because his shots tended to "slice" to the right. *Ibid.* The plaintiff was playing the course and driving his cart at the ninth hole, which ran parallel to the left of the driving range. *Ibid.* The defendant hit a ball off the heel of his club, "hooking" the ball to his left, and the ball struck the plaintiff in the eye. *Ibid.* The trial court granted summary judgment for the defendant. *Ibid.*

The appellate court ruled that the recklessness standard applied to golf. *Id.* at 616. In finding that the defendant was not reckless as a matter of law, the court explained that "[a]s those persons who play golf well know, 'shanking the ball is a foreseeable and not uncommon occurrence.... The same is true of hooking, slicing, pushing, or pulling a golf shot.'" *Ibid.* (citation omitted). Moreover, the court noted, "[b]ecause of the great likelihood of these unintended and offline shots, it can indeed be said that the risk of being inadvertently hit by a ball struck by another competitor is built into the game of golf." *Ibid.*

Another case upholding summary disposition in a golf setting is *Thompson v. McNeill,* 53 *Ohio St.*3d 102, 559 *N.E.*2d 705 (1990). In that case, the defendant hit her ball from the fairway into a water hazard. After the plaintiff went to search for the errant ball, the defendant hit another ball. The parties disputed whether

that second shot was unannounced. The plaintiff remained to the defendant's right at the water hazard at a distance estimated as twelve to fifteen yards from the defendant. The defendant "shanked" the second shot, and the ball struck the plaintiff in the right eye, causing her severe injury. *Id.* at 706.

The Supreme Court of Ohio found that the defendant was not reckless as a matter of law and affirmed the trial court's grant of summary judgment. *Id.* at 709. The court stated:

> [W]e hold that summary judgment for [the defendant] was appropriate.... We would stress that "[i]t is well known that not every shot played by a golfer goes to the point where he intends it to go. If such were the case, every player would be perfect and the whole pleasure of the sport would be lost. It is common knowledge, at least among players, that many bad shots must result although every stroke is delivered with the best possible intention and without any negligence whatsoever."
>
> [The plaintiff] was off to [the defendant's] right at such a sharp angle that she was not in the intended path of [the defendant's] ball. There was no recklessness here and certainly no intentional misconduct. The rules of golf require that one call out "fore" when a shot goes awry, but in this instance the ball was traveling so rapidly that such a warning would have availed nothing.
>
> *[Ibid.* (citation omitted).]

The above cases, all decided on motions for summary judgment, illustrate the stringent manner in which the recklessness standard should be applied in recreational sport cases, especially golf. In one of those cases, *Thompson v. McNeill,* the parties disputed whether the defendant warned the plaintiff that she (the defendant) was about to take a second shot. In another case, *Gray v. Giroux,* the shot that caused injury was taken without warning to the plaintiff. In each instance, the court granted summary judgment in favor of the defendant.

When a golfer steps onto the golf course, he or she knows that other golfers are likely to "slice," "hook," or "shank" shots. The likelihood of such wayward shots is an inherent part of the game. Courts from other jurisdictions have recognized that reality, correctly choosing not to expose golfers to liability for their erroneous or incompetent swings under factual situations similar to the present case.

## II.

In *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 529, 666 *A.*2d 146 (1995), this Court emphasized that "a nonmoving party cannot defeat a motion for summary judgment merely by pointing to *any* fact in dispute." Moreover, the Court stressed that "where the party opposing summary judgment points only to disputed issues of fact that are 'of an insubstantial nature,' the proper disposition is summary judgment." *Ibid.* (citations omitted). In my view, the disputed facts cited by the majority are not material and, therefore, they cannot form the basis of overturning the trial court's disposition.

Unlike the majority, I believe that this case turns on only two facts: first, that defendant was at the tee for the purpose of hitting the ball straight toward the green; and second, that at the time of defendant's shot, plaintiff was positioned forty-five degrees to the left of the tee box. Those facts are undisputed in the record. Significantly, as plaintiff himself admitted at his deposition, defendant did not intend to hit plaintiff with the ball:

Q. Do you think that [defendant] intended to hit you with his golf ball?

A. No.

Q. Do you think that this was anything more than an accident?

A. No.

By that acknowledgment, plaintiff buttresses the inescapable conclusion to be drawn from this record, namely, that plaintiff stood outside the intended line of flight of defendant's shot. That being the case, the fact that defendant may have taken an unannounced "mulligan" is not material or relevant to the Court's disposition. Defendant's "line of fire" reference was explained by defendant to mean, "[e]verybody's in the line of fire when you hit a golf ball. You play golf." Viewed in that context, defendant's reference does no more than support the notion that the risk of injury is a foreseeable, albeit unfortunate, aspect of all sporting games. Together, the parties' respective comments render the mulligan issue immaterial in my view.

In the same vein, we need not decide whether a mulligan is a recognized part of golf. If required to reach that question, however, I would conclude that because golfers widely understand what is meant by a mulligan, this Court may take judicial notice of that term. See *Wright v. Spinks,* 722 *N.E.*2d 1278, 1279 (Ind.Ct. App.2000) (taking judicial notice of meaning of mulligan). In so doing, I would find as a matter of law that the practice of taking a second shot off the tee is a foreseeable aspect of the game. *See* Mel Narol, *Sports Torts: Standard on the Line,* New Jersey Lawyer: The Weekly Newspaper, Nov. 20, 2000 at 7 ("With respect to whether hitting a mulligan is 'part of the game' of golf, the mere fact it is a long-time common occurrence in recreational golf, and even has a proper name attached to the shot, might be viewed as strong evidence that golfers recognize this as part of the game.").

It bears repeating that in *Thompson v. McNeill, supra,* 559 *N.E.*2d at 706, the parties disputed whether the defendant, after "shanking" her shot, warned or announced to the plaintiff that she (the defendant) was about to take an additional shot. Notwithstanding that dispute, the Supreme Court of Ohio upheld the trial court's summary disposition in favor of the defendant. The high court concluded that "[the defendant's additional swing] was not a prohibited or reckless shot. [The defendant] did not recklessly expose [the plaintiff] to more danger than any golfer faces in participating in a game of golf." *Id.* at 709.

Interestingly, the Ohio Supreme Court also observed that the defendant would not be liable for the plaintiff's injury even under a negligence standard because the plaintiff's "position relative to [the defendant] placed [the plaintiff] outside the zone of danger." *Id.* at 709 n. 2. Although that observation was not necessary for the court's holding, it indicates the extent of the willingness of some jurisdictions to shield amateur athletes from costly and onerous litigation.

As noted, the parties in this case do not dispute that plaintiff was located at a forty-five degree angle from the tee at the time of

defendant's swing. Generally, golfers intend to hit straight shots off the tee, not shots that "hook" or "slice" the ball either to the left or right. John Allan May, *The Complete Book of Golf* 54–55 (Gallery Books 1991). Someone in plaintiff's position, located at an acute angle from the tee on a straight-away hole, is not in the intended path of a fellow golfer's tee shot. Plaintiff conceded as much when he stated at his deposition that he did not believe that defendant intended to hit him with the ball.

Thus, I do not share the majority's conclusion that the dispute concerning whether defendant warned or waved to plaintiff is material for purposes of summary judgment. A golfer is not required to warn other golfers of an impending shot if those other golfers are not within the shot's intended line of flight. See *Carrigan v. Roussell*, 177 *N.J.Super.* 272, 278–79, 426 *A.*2d 517 (App.Div.1981). (Although *Carrigan* was decided on the basis of the now-inapplicable negligence standard, the court's statement that a golfer is not required to warn other golfers positioned outside the "ambit of danger" remains instructive.) Because I find that plaintiff was not in the intended path of defendant's shot, I would conclude that defendant owed no special duty to plaintiff.

### III.

I would also rely on policy grounds to reinstate the grant of summary judgment. "[I]nformal athletic and recreational sports activities are quite important, as evidenced by their universal popularity in all walks and in all stages of life. To that extent a societal interest is served by encouraging the vigorous partic-ipation in sports activity." *Crawn, supra,* 136 *N.J.* at 503, 643 *A.*2d 600. Anyone who steps onto a golf course, baseball diamond, tennis or basketball court, hockey rink, or soccer or football field must accept the risks inherent in those games.

Parties to a sports-related suit will nearly always be able to highlight *some* disputed facts. For example, in a typical soccer game, there are eleven players from each team on the field, as well as a referee. On the sidelines, there are usually several

coaches for each team, additional team members who are substitutes, and numerous spectators. In a fast-moving game like soccer, an incident on the field that causes injury could be viewed by any number of individuals and from any number of perspectives and vantage points. In that setting, disputed facts are bound to exist. Unless the recklessness standard is applied strictly by the courts, costly and protracted litigation may become the norm.

As this Court declared in *Crawn, supra,* 136 *N.J.* at 508, 643 *A.*2d 600, "[t]he heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms." Using *Crawn* as my guide, I would conclude that defendant's inability to hit a straight shot off the tee was not the type of excessively harmful or egregious conduct that justifies submitting this case to the jury. I fear that the majority's contrary conclusion may undermine the effectiveness of the recklessness standard as a deterrent to sports-related litigation.

A California appeals court recently articulated a similar concern related specifically to golf. The court stated:

> Holding participants liable for missed hits would only encourage lawsuits and deter players from enjoying the sport. Golf offers many healthful advantages to both the golfer and the community. The physical exercise in the fresh air with the smell of the pines ... renews the spirit and refreshes the body. The sport offers an opportunity for recreation with friends and the chance to meet other citizens with like interests.... Social policy dictates that the law should not discourage participation in such an activity whose benefits to the individual player and to the community at large are so great.
>
> [*Dilger v. Moyles,* 54 *Cal.App.*4th 1452, 63 *Cal.Rptr.*2d 591, 593 (1997).]

In sum, the judiciary should refrain from interposing any set of rules that would discourage the spirited pursuit of sporting games, unless those rules are clearly necessary to protect the public interest. Unfortunately, injuries do occur on the playing field, even in a non-contact sport like golf. On balance, the public is best served by having players assume the risks of those injuries absent egregious conduct on the part of their fellow participants. By my reading of the record, defendant's only "offense" is that he

hit an errant ball. He intended no injury to plaintiff. Accordingly, the public is not harmed by sustaining the grant of summary judgment in favor of the amateur athlete in this case.

## IV.

This Court has observed that punitive damages may be imposed when a plaintiff is able to prove that a defendant acted recklessly. *Smith v. Whitaker*, 160 *N.J.* 221, 242, 734 *A*.2d 243 (1999) (citing *N.J.S.A.* 2A:15–5.10). The Court has previously explained:

> Mere negligence, no matter how gross, will not suffice as a basis for punitive damages. Rather, plaintiff must prove by clear and convincing evidence a "deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences." "The defendant, however, does not have to recognize that his conduct is 'extremely dangerous,' but a reasonable person must know or should know that the actions are sufficiently dangerous."
>
> [*Ibid.* (citations omitted).]

Here, the Court's disposition exposes this and similarly-situated defendants to the possibility of punitive damages. That possibility reinforces my view that the unintended consequence of the majority's holding is that it may foster more sports-related lawsuits and potentially punish well-intended athletes engaged in a variety of sports. Although it erred in applying the negligence standard, the Appellate Division below correctly concluded that "[u]nder plaintiff's version of the facts, defendant's conduct cannot be considered 'wantonly reckless' so punitive damages are not awardable." I would rely on that conclusion as additional support to dismiss plaintiff's complaint as a matter of law.

## V.

For the reasons stated, the Court should reverse the judgment of the Appellate Division and reinstate the trial court's grant of summary judgment.

*For affirmance as modified and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—6.

*Concurring in part/Dissenting in part*—Justice VERNIERO—1.