66 A.3d 1252

DANIEL ANGLAND AND DANIEL WHEELER, CO–ADMINISTRA-TORS OF THE ESTATE OF ROBERT E. ANGLAND, AND CHARLES JOHNSON, IV, ADMINISTRATOR OF THE ESTATE OF NANCY ANGLAND, PLAINTIFFS–RESPONDENTS, v. MOUNTAIN CREEK RESORT, INC., A NEW JERSEY CORPO-RATION, DEFENDANT–RESPONDENT, AND WILLIAM TUCK-ER BROWNLEE, DEFENDANT–APPELLANT.

MOUNTAIN CREEK RESORT, INC., THIRD–PARTY PLAINTIFF/RESPONDENT, v. WILLIAM TUCKER BROWNLEE, THIRD–PARTY DEFENDANT.

Argued January 14, 2013—Decided June 6, 2013.

574

*John Burke* argued the cause for appellant (*Burke & Potenza*, attorneys).

*Phillip C. Wiskow* argued the cause for respondents Daniel Angland and Daniel Wheeler, Co–Administrators of the Estate of Robert E. Angland, and Charles Johnson, IV, Administrator of the Estate of Nancy Angland (*Gelman Gelman Wiskow & McCarthy*, attorneys).

*Samuel J. McNulty* argued the cause for respondent Mountain Creek Resort, Inc. (*Hueston McNulty*, attorneys; *Mr. McNulty, John F. Gaffney* and *Stephen H. Shaw*, on the brief).

Justice HOENS delivered the opinion of the Court.

Plaintiffs' decedent, Robert Angland, was skiing on the slopes at the ski resort operated by defendant Mountain Creek Resort, Inc., when he was involved in a collision with defendant William Tucker Brownlee. At the time of the collision, Brownlee was snowboarding on the same slope. Although there is little direct evidence and no agreement among the parties about how or why Angland and Brownlee collided, it is undisputed that following the collision, Angland fell and slid down the slope. When he was found by Brownlee, Angland was lying unconscious near a concrete bridge that spanned the trail. Angland was transported to the hospital and treated, but he died several days later.

There is no question about the applicability of the New Jersey Ski Act, *N.J.S.A.* 5:13–1 to –12, to the claims brought by plaintiffs against defendant Mountain Creek, the ski resort. The question

raised in this appeal, rather, is whether that statute also applies to plaintiffs' claim against Brownlee, as plaintiffs assert, or whether Brownlee's liability, as he contends, instead is governed by common law standards that generally apply to claims between participants involving injuries sustained in recreational sporting activities.

I.

Because we review this matter in the context of Brownlee's motion for summary judgment, our recitation of the facts gives the benefit of all favorable inferences to plaintiffs. *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

Angland, described as a "very good skier" who had a season pass to use the facilities at Mountain Creek, was skiing on a beginner trail on January 19, 2007. Brownlee, who was an intermediate-level snowboarder, was on the same trail when his snowboard and Angland's skis made contact, causing both him and Angland to fall. After the collision, Angland slid down the hill toward the base of a concrete bridge that spanned the trail. Brownlee, however, was able to get up quickly and look around for the person with whom he had collided.

Brownlee saw Angland lying near the concrete bridge supports and went to his aid. Realizing that Angland was unconscious, Brownlee called for help and he remained in the area as Angland was taken from the resort and transported to the hospital. Based on the findings of the treating doctors, Angland sustained a skull fracture consistent with having collided with the concrete bridge. He died a few days after the accident without having regained consciousness.

Brownlee has given several statements concerning how the contact between his snowboard and Angland's skis happened. Although those statements differ about some of the details, the essence of his explanation is consistent. Brownlee asserts that as he was snowboarding down the hill, a person whose identity has never been established either fell in front of him or cut him off,

causing him to turn as he attempted to avoid a collision with that person. Brownlee's evasive maneuver, however, caused him to lose control of his snowboard, which became entangled in Angland's skis, resulting in the collision between the two of them.

The original complaint in this matter, which was filed on behalf of the Estate of Robert E. Angland, sought damages from defendant Mountain Creek and was premised solely on a violation of the Ski Act. The complaint asserted that the concrete bridge was a man-made hazard and that the ski resort was liable because it failed to remove the bridge from the trail, make it safe, or warn Angland and others of its existence, contrary to the resort's statutory duty of care. *See N.J.S.A.* 5:13–3(a)(3).

When Mountain Creek filed its answer to the complaint, it included a third party complaint against Brownlee. Mountain Creek alleged that Brownlee failed to comply with the duties of care that are imposed on skiers by the Ski Act, *see N.J.S.A.* 5:13–4, and that he therefore was liable to the ski resort for his negligent conduct. In the same pleading, Mountain Creek also asserted claims against Brownlee based on theories of contract and indemnity. Thereafter, plaintiffs filed their amended complaint, through which they added direct claims against Brownlee. Plaintiffs' claims were premised on their assertion that Brownlee was subject to the statutory duties established in the Ski Act and that he therefore owed Angland a duty of care which he had violated.

Following discovery, Brownlee moved for summary judgment. He did not dispute that snowboarding is an activity that is generally covered by the Ski Act. *See N.J.S.A.* 5:13–2(c) (defining skier to include person operating toboggan, sled and similar equipment); *Murray v. Great Gorge Resort, Inc.,* 360 *N.J.Super.* 395, 399–400, 823 *A.*2d 101 (Law Div.2003) (concluding that snowboarding is included within statutory definition of skiing). Rather, Brownlee argued that the Ski Act does not apply to claims made between skiers and that the appropriate standard of care instead is the standard established by the common law. He asserted that

the common law standard of care that applies to claims between participants in recreational activities is recklessness rather than mere negligence, *see Crawn v. Campo,* 136 *N.J.* 494, 500–01, 643 *A.*2d 600 (1994), and that he was entitled to judgment as a matter of law because there was no evidence that his conduct was reckless.

Plaintiffs, in opposing Brownlee's motion, pointed out that the Ski Act includes a section that specifically defines the duties of skiers. *See N.J.S.A.* 5:13–4. They argued that by including this section in the Ski Act, the Legislature made clear its intention that the statute would apply to claims arising from behavior between individuals who are participants in skiing activities. Arguing in the alternative, plaintiffs asserted that even if the common law recklessness standard applied to claims between skiers, Brownlee's motion should be denied because there was sufficient evidence in the record from which a finder of fact could conclude that he was reckless.

The trial court, in agreeing with plaintiffs, relied on three sources of support for its analysis. First, focusing on the statutory duties imposed on skiers, the court noted that two of those duties refer to avoiding collisions with or injury to other skiers. *See N.J.S.A.* 5:13–4(b)(4), (b)(5). Second, the court looked to the stated purpose of the Ski Act which is to "define[ ] the responsibility of ski area operators and skiers." *N.J.S.A.* 5:13–1(b). Third, the court relied on language found in an opinion of this Court which described the Ski Act as "completely . . . displac[ing] the common law" and "occupying the entire field." *Brett v. Great Am. Recreation,* 144 *N.J.* 479, 502, 677 *A.*2d 705 (1996). Relying on those three sources, the trial court concluded that Brownlee's conduct was governed by the negligence standard of the Ski Act rather than by the common law recklessness standard. The court therefore denied Brownlee's motion, finding that there was sufficient evidence in the record to create a genuine issue of material fact about his conduct and therefore about whether he violated the statutory duty of care.

The Appellate Division affirmed the judgment of the trial court, agreeing that the Ski Act establishes the duty of care that applies to all skiers and that there was sufficient evidence in the record to create a question for the jury as to whether Brownlee violated that duty of care.

We granted Brownlee's motion for leave to appeal, 209 *N.J.* 99, 35 *A.*3d 682 (2012), and we thereafter permitted Mountain Creek, which in the interim had reached a settlement with plaintiffs, to participate as an amicus curiae.

II.

Brownlee, relying on the language used in the Ski Act and the legislative history surrounding its enactment, argues that the statute does not apply to claims between skiers. He points out that the legislative history makes it clear that the Ski Act was not designed to regulate claims between skiers, but instead was enacted to address only claims that arise between a skier and the ski resort operator. Brownlee contends that the trial and appellate courts, by focusing on the statute's recitation of the duties of skiers, missed the larger context in which the statute was enacted and overlooked the very specific concerns the Legislature intended to address when enacting the Ski Act.

As part of this argument, Brownlee points out that there are ski statutes in other states that include skier-to-skier liability provisions that are absent from our Ski Act. He argues that because some of those statutes were enacted around the same time as our Ski Act, we should presume that our Legislature was aware of this possible approach and chose not to adopt it. In his view, this lends further support to his assertion that the Ski Act does not govern plaintiffs' claim against him.

Based on his assertion that the Ski Act does not apply to litigation between skiers, Brownlee argues that the statute's negligence standard does not apply to plaintiffs' claims against him. He contends that the proper standard of care to be used to judge his conduct is the recklessness standard applied to participants en-

gaged in all other recreational sports. He urges us to direct entry of judgment in his favor, arguing that there is nothing in the record that would support the conclusion that his conduct was reckless.

Plaintiffs argue that the legislative history and plain language of the Ski Act demonstrate that it was intended to govern claims between skiers. They find support for their argument in committee reports issued in connection with the statute's passage and in the language the Legislature used to define the statute's purpose and to delineate the duties imposed on skiers. Plaintiffs further assert that the trial and appellate courts correctly concluded that this Court has already settled this question, deciding it in favor of their position on the statute's scope. *See Brett, supra*, 144 *N.J.* at 502, 677 *A*.2d 705.

Arguing in the alternative, plaintiffs assert that even if Brownlee is correct that the common law standard of recklessness applies to litigation between skiers, he is not entitled to summary judgment. They argue that the record, when tested against a recklessness standard, presents genuine issues of material fact as to whether there was a phantom skier whom defendant swerved to avoid and whether his response to such a skier was reckless under the circumstances.

Amicus curiae Mountain Creek joins in plaintiffs' argument that the Ski Act was meant to apply to claims between skiers and that it fixes a knowing standard for such claims. It argues that although the recklessness standard applies in general to recreational activities, it does not apply to activities, including skiing, for which the Legislature has established a different statutory duty of care.

### III.

This appeal presents us with two questions. First, we consider whether the statutory standard of care fixed by the Legislature in the Ski Act governs claims made between skiers. Second, if it does not, we consider whether, when tested against the common

law standard of care, there is enough evidence in the record to require that plaintiffs' claim against Brownlee be determined by a jury.

## A.

The scope of the standard of care established in the Ski Act can only be appropriately understood in the context of the Legislature's reasons for the statute's enactment. We recently had occasion to explore the legislative history of the Ski Act in detail, focusing on the reasons that motivated its passage as well as the purpose it was designed to achieve. *See Hubner v. Spring Valley Equestrian Ctr.*, 203 *N.J.* 184, 198–202, 1 *A.*3d 618 (2010). We undertook that analysis of the Legislature's intent in enacting the Ski Act as part of our effort to understand the meaning and intent of the Equine Act, *N.J.S.A.* 5:15–1 to –12, which was patterned after the Ski Act's utilization of "assumption of risk principles to allocate responsibility for injuries sustained in inherently dangerous recreational activities[,]" *Hubner, supra*, 203 *N.J.* at 198, 1 *A.*3d 618.

In *Hubner*, we explained that the Ski Act was passed as the Legislature's response to the decision of the Vermont Supreme Court in *Sunday v. Stratton Corp.*, 136 *Vt.* 293, 390 *A.*2d 398 (1978). In *Sunday*, the Vermont Supreme Court rejected a ski resort's assertion that a novice skier's suit for injuries sustained while skiing was barred because the skier assumed the inherent risks of the sport. *Id.* at 403. That holding was based on the Vermont court's effort to harmonize the doctrine of assumption of the risk with the principles expressed in Vermont's then recently enacted comparative negligence statute. *See ibid.* The Vermont Supreme Court achieved that purpose by concluding that if there are inherent risks that the skier assumes, then those risks are matters as to which a ski resort owes no duty of care to the participant at all. *Ibid.* Although on the surface, that reasoning might appear to create little room for ski resorts to be found liable

to skiers, in reality, as applied by the Vermont Supreme Court, it did not. *See ibid.*

As we explained in *Hubner,* "[i]n applying that analysis to the facts in *Sunday,* the court reasoned that the ski area operator had a duty to maintain the slopes, and that the assumption of risk doctrine could not bar suit if the injury was caused by the condition of the 'field' rather than by the 'playing of the sport' itself. [*Sunday, supra,* 390 *A.*2d at 403] (quoting *Garafano v. Neshobe Beach Club, Inc.* [126 *Vt.* 566], 238 *A.*2d 70, 76 ( [Vt.] 1967))." *Hubner, supra,* 203 *N.J.* at 199, 1 *A.*3d 618.

In part, the Vermont Supreme Court based its analysis in *Sunday* on a 1959 decision of this Court addressing the allocation of risks and losses arising in the context of inherently dangerous recreational activities. *See Sunday, supra,* 390 *A.*2d at 402–04 (citing *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N.J.* 44, 48–50, 155 *A.*2d 90 (1959)). This Court, in *Meistrich,* had explained that there are two kinds of assumed risk, but that only one would create a bar to recovery when applying contributory negligence principles. *Meistrich, supra,* 31 *N.J.* at 48–51, 155 *A.*2d 90 (describing concepts of primary and secondary assumption of risk). As we explained in *Hubner,* although the decision of the Vermont Supreme Court was consistent with the analytical framework of *Meistrich,* it appeared to have rejected the viability of a defense to claims arising from both types of assumed risk, thus creating uncertainty about allocation of responsibility as between operators and participants generally. *See Hubner, supra,* 203 *N.J.* at 201–02, 1 *A.*3d 618.

■  Our Legislature responded to the *Sunday* decision with its swift passage of the Ski Act. *See* Assembly Judiciary, Law, Public Safety and Defense Committee, *Statement to Assembly Bill No. 1650,* at 1 (Nov. 20, 1978) (identifying Vermont Supreme Court's decision as impetus for bill); *Governor's Press Release for Assembly Bill No. 1650,* at 1 (Feb. 22, 1979) (same). More to the point, our Legislature made its reasons for enacting the Ski Act explicit. It explained that the decision in *Sunday* had "caused considerable

concern nationwide among ski area operators and their insurers over the potential liability" to skiers. *Statement to Assembly Bill No. 1650, supra,* at 1. It observed that this

> uncertainty over what effect the *Sunday* case will have on the liability of ski area operators for skiing injuries has led to increases in the cost of liability insurance. It also poses a threat to the availability of this type of insurance which is currently provided by only a few insurers.
>
> [*Ibid.*]

Having articulated the concern that motivated it to act as being the threat to the availability of insurance for resort operators, the Legislature announced its intent in clear and unmistakable language: "[t]he bill, as introduced, proposes to deal with the problem by specifically listing the responsibilities of ski area operators and skiers." *Ibid.*

The Legislature's sole focus, therefore, was upon the continued viability of the ski industry and, in particular, the ability of resort operators to secure insurance. That concern arose because the *Sunday* decision essentially left open the question of where the line would be drawn between those injuries that were caused by the condition of the field, as to which the operator would be liable, and those that were the result of the playing of the sport itself, as to which assumption of the risk would bar recovery for the injured participant. *See Sunday, supra,* 390 A.2d at 403.

In order to address that concern, the Legislature utilized traditional assumption of the risk principles as well as statutory comparative negligence concepts to allocate responsibility between resort operators and skiers. It did so by defining the responsibilities of ski area operators, *N.J.S.A.* 5:13–3, by limiting the liability of ski area operators to a breach of one of those responsibilities, *N.J.S.A.* 5:13–3(d), and by identifying the duties of skiers, *N.J.S.A.* 5:13–4, and the risks that they assume, *N.J.S.A.* 5:13–5, for which the operator will not be liable, *N.J.S.A.* 5:13–6. In clear language, the Legislature provided that because of the participant's assumption of the identified risks, his or her suit arising from an injury due to any of those inherent risks would be barred. *N.J.S.A.* 5:13–6. The Legislature further made plain that the principles

embodied in the comparative negligence statute, *see N.J.S.A.* 2A:15–5.1, would apply if the claim arose because the ski area operator breached one of its defined statutory duties, *N.J.S.A.* 5:13–6.

■   Seen, then, in its historical context, the Ski Act was designed to serve a specific purpose. It operates to fix duties of skiers and ski resort operators in order to regulate their conduct in the context of creating certainty in the claims that arise between them. It does so in order to delineate the allocation of risk and thereby to ensure that the ski area operators are able to secure insurance that will respond to the claims that the statute permits. The Ski Act, as the legislative history demonstrates, therefore has as its particular purpose the allocation of responsibility between operators and skiers so as to ensure the continued viability of the ski resort industry; it was not designed to govern claims as between participants who engage in recreational activities at ski resorts.

That the Ski Act was not designed to address claims between skiers is apparent as well from its inclusion of a reference to "other skiers" in the list of inherent risks of skiing that each skier is deemed to have assumed. *N.J.S.A.* 5:13–5 (providing that "skier is deemed to have knowledge of and to assume the inherent risks of skiing ... created by ... other skiers"). That reference, placed in the section of the statute that addresses the inherent risks of skiing, aligns with the statute's provision that claims against the operator for such risks are barred. *N.J.S.A.* 5:13–6. The implication is clear; had the Legislature intended to define the standard of care that would apply to claims as between skiers, it would have done so. Instead, the statute, consistent with the legislative purpose, simply insulates the operator from liability for claims arising from acts of other skiers.

This analysis of the statute is guided by the great clarity with which our Legislature spoke in enacting the Ski Act. Although Brownlee also suggests that we derive support for our conclusion by reference to statutes enacted in our sister states, we need not

do so and we decline to speculate about whether our Legislature was aware of, or considered, approaches taken elsewhere.

Moreover, although there were ski statutes in existence prior to the decision in *Sunday*, it is not clear that any of their provisions relating to collisions between skiers created a cause of action as between skiers. On the contrary, it appears that those statutes, whether enacted before or after our Ski Act, were designed to protect the resort operator from liability for a collision between skiers. *See, e.g., Idaho Code Ann.* § 6–1106 (1979) (providing that "responsibility for collisions by any skier while actually skiing, with any person, shall be solely that of the individual or individuals involved in such collision and not that of the ski area operator"); *N.D. Cent.Code* § 53–09–06 (1979) (providing that skiers, and not resort operators, are solely responsible for collisions with other persons or objects while skiing); *N.M. Stat. Ann.* § 24–15–2 (1969) (providing that "primary responsibility for the safety of the individual skier while engaging in the sport of skiing rests with the skier himself"); *N.H.Rev.Stat. Ann.* § 225–A:25(IV) (1965) (originally providing that "responsibility for collision by a downhill skier ... with any person or object shall be solely that of the downhill skier").

Although it is unnecessary, therefore, for us to engage in a more exhaustive survey of the statutory approaches utilized in other states, our conclusion that the Ski Act is intended to address duties and responsibilities between ski area operators and skiers and that it does not apply to claims made between skiers is consistent with the views expressed by courts in other states that have analyzed ski statutes similar to ours.

For example, the Ohio Supreme Court concluded that its ski act, *Ohio Rev.Code Ann.* §§ 4169.01–.99, was intended to "address[ ] certain obligations and limitations on liability pertaining to ... ski-area operators and ski-area visitors[,]" but that it "does not apply to personal-injury litigation between skiers." *Horvath v. Ish,* 134 *Ohio St.*3d 48, 979 *N.E.*2d 1246, 1250–51 (2012). Similarly, the Connecticut Supreme Court determined that its ski statute,

*Conn.Gen.Stat.* §§ 29–201 to –213, was intended "to clarify the relationship between skier and ski area operator with regard to the risks assumed by the skier ... and the duties owed to skiers by the operator." *Jagger v. Mohawk Mountain Ski Area, Inc.,* 269 *Conn.* 672, 849 *A.*2d 813, 829 n. 21 (2004). Observing that the statute was enacted in response to the *Sunday* decision, *id.* at 824–25, the Connecticut Supreme Court further noted that there was nothing in the legislative history to imply that the statute was intended to apply to negligence actions between skiers, *id.* at 829 n. 21. In addition, the appellate court in New York, interpreting the Massachusetts Ski Safety Act, *Mass. Gen.Laws* ch. 143, § 710, reached the same conclusion, holding that the Massachusetts statute was enacted to "limit the liability of ski area operators for injuries to skiers" and not to "impose a new statutory duty upon skiers such that a collision with another skier constitutes negligence per se." *Wolfson v. Glass,* 301 *A.D.*2d 843, 754 *N.Y.S.*2d 82, 84 (2003) (internal citations omitted).

In arguing that the Ski Act expresses the will of the Legislature concerning the standard that should apply to claims as between skiers, plaintiffs and amicus curiae Mountain Creek correctly cite the statutory duties imposed on skiers, but they miss the larger context of the concern that the statute was intended to remedy. If we look only to the section of the Ski Act that lists duties assigned to skiers, *N.J.S.A.* 5:13–4, we might conclude that these duties apply in all contexts and as against all parties. Although that section of the Ski Act delineates the duties of skiers, and although certain of those duties refer to a skier's duty as it relates to other participants, *see N.J.S.A.* 5:13–4(b)(4), –4(b)(5), nothing in the statutory framework addresses claims as between participants.

Nor would adopting the approach urged on us by plaintiffs and amicus advance the intent our Legislature expressed in enacting the statute. Because the Ski Act was intended to fix duties of resort operators and of skiers as a response to an insurance and litigation crisis that threatened the survival of the resorts, we must take care to see the statute through that prism. The Ski Act

defines duties of skiers as a way to identify inherent risks of skiers that are assumed by the skier, *N.J.S.A.* 5:13–5, and that therefore cannot be the basis for a claim against the resort, *N.J.S.A.* 5:13–6. Indeed, the sections fix responsibilities between operators and skiers, *see N.J.S.A.* 5:13–3, –4, and provide that a skier who violates one of those statutory duties will be precluded from recovery against the resort operator, *see N.J.S.A.* 5:13–6; the Ski Act says nothing about suits between skiers or the standard of care that will apply as between two participants.

So, too, must this Court's decision in *Brett* be understood in its context. We did not hold that the Ski Act applies to claims made by one participant against another; instead we addressed claims by tobogganers against a resort that claimed it owed them no duty because they were trespassers. *Brett, supra,* 144 *N.J.* at 493–94, 677 *A.*2d 705. As a prelude to addressing the tobogganers' claim against the resort, this Court discussed the Ski Act generally. Although we used apparently expansive terms like "pre-empt[ ]" to describe its scope, we limited our focus by observing that the Ski Act's pre-emption is of "the law of ski-area operators' liability." *Id.* at 502, 677 *A.*2d 705. Carefully read, the language is strictly tied to the intent of the Legislature in the context of the concern the statute was designed to address. We concluded that the "Legislature intended completely to displace the common law" but only "where the Ski Statute properly applies." *Ibid.* And we used the term "pre-empt[ ]" only in relationship to the liability of resort operators. *Ibid.* We therefore did not conclude in *Brett* that the Ski Act completely displaced the common law in all circumstances, but only that it did when a skier makes a claim against a resort.

We find nothing in the legislative history or in the language of the Ski Act to suggest that the Legislature intended to do anything other than what it identified to be the statute's purpose. The plain language of the statute, the legislative history, and the overall context of the circumstances that gave rise to the statute's enactment make clear that the focus was on creating certainty in

respect of claims brought by participants against operators of ski resorts. That concern, fuelled largely by the threat of closure of such resorts for lack of availability of insurance, was a specific one, and not a general pronouncement about the duties owed between skiers.

The Legislature, in enacting the Ski Act, limited its focus to claims that would be brought against a ski area operator for injuries sustained at the resort and did not address claims that might be brought as between participants in the sport of skiing. We therefore turn to an analysis of the framework that governs claims arising as between participants.

### B.

The common law standard of care that ordinarily applies as between individuals involved in recreational sporting activities, as we have explained, is not breached by mere negligence. As we have held, "the duty of care applicable to participants in informal recreational sports is to avoid the infliction of injury caused by reckless or intentional conduct." *Crawn, supra,* 136 *N.J.* at 497, 643 *A.*2d 600.

In reaching that conclusion, we noted that a greater-than-negligence standard for sporting activities was favored by a "majority of jurisdictions that have considered the issue." *Id.* at 499, 643 *A.*2d 600. Moreover, we concluded that adopting the recklessness standard "is primarily justified by two policy reasons." *Id.* at 501, 643 *A.*2d 600. First, applying a greater-than-negligence standard promotes "vigorous participation in athletic activities." *Ibid.* Second, adopting the recklessness standard to apply to recreational sporting activities also "avoid[s] a flood of litigation." *Ibid.*

Further explaining our holding, we stated:

Our conclusion that a recklessness standard is the appropriate one to apply in the sports context is founded on more than a concern for a court's ability to discern adequately what constitutes reasonable conduct under the highly varied circumstances of informal sports activity. The heightened standard will more likely result

in affixing liability for conduct that is clearly unreasonable and unacceptable from the perspective of those engaged in the sport yet leaving free from the supervision of the law the risk[-]laden conduct that is inherent in sports and more often than not assumed to be "part of the game."

One might well conclude that something is terribly wrong with a society in which the most commonly-accepted aspects of play—a traditional source of a community's conviviality and cohesion—spurs litigation. The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms.

[*Id.* at 508, 643 *A.*2d 600.]

Although we first addressed this question in the context of a claim involving direct physical contact between softball players, *id.* at 496–98, 643 *A.*2d 600 (discussing recklessness standard as applied to softball player sliding into catcher at home plate), we have since made it clear that "the recklessness or intentional conduct standard of care applies generally to conduct in recreational sporting contexts," even when those activities do not ordinarily involve direct contact between participants, *Schick v. Ferolito,* 167 *N.J.* 7, 22, 767 *A.*2d 962 (2001) (explaining scope and meaning of recklessness standard as applied to golf); *see Stelluti v. Casapenn Enters.,* 203 *N.J.* 286, 307–08, 1 *A.*3d 678 (2010) (discussing recklessness and assumption of risk in context of health club's effort to limit liability by contract).

Indeed, we have cautioned that "[t]he recklessness or intentional conduct standard of care articulated in *Crawn* was not meant to be applied in a crabbed fashion[,]" and we have found no meaningful distinction to be drawn between sports that are "commonly perceived" to be "contact" sports and those that are not. *Schick, supra,* 167 *N.J.* at 18–19, 767 *A.*2d 962. Rather, because we had previously recognized that "the risk of injury is a common and inherent aspect of informal sports activity[,]" *Crawn, supra,* 136 *N.J.* at 500, 643 *A.*2d 600, we saw no reason to adopt a framework that would utilize a different standard for different types of recreational endeavors, *Schick, supra,* 167 *N.J.* at 18–19, 767 *A.*2d 962. Nor do we find any basis on which to alter that approach in the context of this dispute.

However, the recreational sport of skiing, as well as the related sports of sledding, tobogganing, *N.J.S.A.* 5:13–2(c) (defining skier as one who skis or operates "toboggans, sleds or similar vehicles"), and snowboarding, *see Murray, supra,* 360 *N.J.Super.* at 399–400, 823 *A.*2d 101 (concluding that snowboarding is included in statutory definition of skiing), are activities that present a hybrid circumstance. When an injured participant makes a claim against the resort operator, those claims are governed by the Ski Act. When an injured participant makes a claim against another participant, as we have concluded from our analysis of the meaning of the statutory language and the Legislature's intent, the claim is not governed by the Ski Act. Instead, when an injured participant makes a claim against another participant, the other participant's liability will be governed by the recklessness standard established in the common law.

We do not suggest, however, that the Ski Act is entirely irrelevant to plaintiffs' claim against Brownlee. On the contrary, although the common law supplies the standard of care that applies in claims between participants, the list of the duties owed by skiers is useful as a means to understand the generally accepted conduct expected of skiers. In evaluating claims between participants in sports that are governed by a set of rules, we have held that whether a participant complied with those rules is "one factor in the totality of circumstances" used to determine whether a participant's conduct was reckless. *See Schick, supra,* 167 *N.J.* at 21, 767 *A.*2d 962. It is in that sense that the statutory enumeration of a skier's duties may be used to inform the jury's analysis of Brownlee's behavior, and by extension, his liability to plaintiffs.

That is, a skier who violates one of the duties identified in the Ski Act, but who is merely negligent in doing so will not be liable to another skier; but a skier who violates one of those duties and does so recklessly will be liable to the other participant who is injured as a result. The duties may be the same, but the standard of conduct that will be required to support a finding of liability is

different depending on whether the claim is brought against a resort operator or against another participant.

## IV.

■ Having fixed the appropriate standard of care that will govern the claims made by plaintiffs against Brownlee, we turn to the second question raised in this appeal. Brownlee asserts that because the common law standard of recklessness applies to plaintiffs' claims, he is entitled to summary judgment. Plaintiffs disagree, arguing that there is sufficient evidence in this record to permit them to proceed with their proofs before a jury.

We review the record, as we must, in the light most favorable to plaintiffs, who are the non-moving parties. *See Brill, supra,* 142 *N.J.* at 523, 666 *A.*2d 146. The record includes Brownlee's several explanations about why he turned and collided with Angland. All of Brownlee's explanations are premised on the existence of a phantom skier who he asserts he was trying to avoid. Plaintiffs, in response, contend that there is no evidence to support Brownlee's claim as to the existence of such an individual and that Brownlee's story is belied by his failure to promptly offer a description of that skier. Although that dispute alone might not be enough for plaintiffs to withstand summary judgment, it is not their only assertion.

In addition, the record includes references to a report prepared by an expert retained by plaintiffs who opined that Brownlee failed to keep a proper lookout, reacted with a panicked stop, made a sudden change of direction, behaved in an unpredictable manner, and failed to readily respond to the unidentified person by taking evasive action in spite of having ample time and opportunity to do so. Those assertions could, if believed by a jury, suffice to support a finding of recklessness.

Reviewing the record before us in accordance with the principles enunciated in *Brill,* and testing it against the common law standard of recklessness that we have concluded is applicable to

plaintiffs' claim against Brownlee, we reject Brownlee's argument that he is entitled to summary judgment.

## V.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the Law Division for trial in accordance with the common law duty of care that we have identified.

*For affirmance as modified and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge CUFF (temporarily assigned)—6.

*Opposed*—None.