**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4308-18T3

WILLIAM BONSALL and
SHERI BONSALL, his wife,

     Plaintiffs-Appellants,

v.

NEW JERSEY TRANSIT,

     Defendant-Respondent,

and

STATE OF NEW JERSEY,
NEW JERSEY DEPARTMENT
OF TRANSPORTATION,
COUNTY OF SOMERSET,
TOWNSHIP OF BERNARDS,
BOROUGH OF BERNARDSVILLE,
and BASKING RIDGE,

     Defendants.[1]

_____

Submitted June 1, 2020 – Decided July 28, 2020

---

[1] The record provided does not disclose why these defendants, besides the Borough of Bernardsville, are either no longer in the case or are not parties to the order being appealed.

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Civil Part, Somerset County, Docket No. L-0573-17.

Hector I. Rodriguez, attorney for appellant.

Hohn & Scheuerle, LLC, attorneys for respondent New Jersey Transit (Marie Sambor Reilly and John A. Thiry, on the brief).

PER CURIAM

In this New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, negligence lawsuit arising from William Bonsall's bike riding accident while crossing railroad tracks owned and maintained by New Jersey Transit (NJT), he and his wife Sheri Bonsall appeal from Law Division orders dismissing their complaint on NJT's summary judgment motion and denying their reconsideration motion. They contend the motion judge erred in granting summary judgment because: (1) the allegation the accident was caused by a dangerous condition is a jury question; (2) the dangerous condition which caused the accident took considerable time to form, therefore putting NJT on actual or constructive notice of the dangerous condition, for which it acted palpably unreasonable in not repairing it; and (3) Sheri should be permitted to

pursue her per quod claim despite the fact she separated from William about a year after the accident and they have remained estranged.[2]

Even looking at the Bonsalls' assertion in the light most favorable to them – the accident was caused by the dangerous condition of a deteriorated public road – there is no showing NJT had actual or constructive notice of the dangerous condition; therefore, summary judgment dismissal was proper and we affirm. Thus, it is unnecessary to address the dismissal of Sheri's per quod claim. Yet, for the sake of completeness, had we concluded William should be permitted to present his claims to a jury, Sheri should have as well.

I.

On May 10, 2017, the Bonsalls filed a three-count complaint alleging a negligently maintained area of road intersected by railroad tracks caused William to fall and suffer injuries while he was riding a bicycle. Sheri claimed she suffered loss of consortium as a result of William's injuries. Named as defendants were the State of New Jersey, NJT, New Jersey Department of Transportation, County of Somerset, Township of Bernards, the Borough of Bernardsville and Basking Ridge.

---

[2] As plaintiffs share a surname, we refer to them by their first names for convenience and with no disrespect intended.

Following discovery, NJT moved for summary judgment against the Bonsalls on January 21, 2019. Bernardsville thereafter cross-moved for summary judgment against NJT and the Bonsalls.

The motion record disclosed the following undisputed facts, which are considered in the light most favorable to the Bonsalls, the parties opposing summary judgment. See Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

A. The Accident

On May 17, 2015, William and his friend Michael Kreuger departed from William's home in Gillette for a bicycle ride under clear and calm weather with dry roads. They were riding on Whitenack Road, where they had ridden half a dozen times before, which is intersected by railroad tracks for NJT's Gladstone Line. Whitenack Road leading up to the railroad tracks is maintained by the Township of Bernards, with the railroad tracks owned and maintained by NJT, and the section of road following the intersection is maintained by the Borough of Bernardsville.

According to Kreuger's deposition testimony, he was riding about twenty miles per hour approximately thirty yards behind William when he observed William's bicycle wobble and fall while crossing the railroad tracks. Both

bicyclists said they would normally apply their brakes at the Gladstone railroad line intersection, Kreuger stating "because it's a steep hill that flattens out at the railroad grade. So, you're reaching maximum velocity just before you get to the tracks." Kreuger testified, "[William] was in full control of his bicycle until he crossed the tracks . . . ."

Looking at photos of the accident scene, taken the day after the accident, Kreuger identified the exact location where William began to lose control of his bicycle and where he fell. Kreuger recalled "that due to the combination of the erosion of the macadam around the [railroad] tracks, and the fact that the track itself is raised up somewhat from grade, . . . when [William] hit it with his front wheel, that front wheel went out from under him."

In his deposition testimony, William stated he was knocked unconscious and has no recollection of the accident. However, regarding his perspective of what caused him to fall, William recalled:

> At some point last year, there was a -- I'm sure that I had gone over with . . . Kreuger. Now in April of this year, my previous attorney's firm said that if I couldn't identify the specific pothole, they were no longer representing me. And then I had a conversation with . . . Kreuger where we looked at all the pictures presented, different angles, different parts of the road, apparently, on the date that this was taken, and were able to determine -- well, based on what he had shared with me, based on what he had witnessed, that this is

the state of disrepair that caused the accident, not the pothole, that is on the easterly side of the tracks.

Looking at a photo[3] at his deposition, William pointed to an area stating, "the pothole immediately west of the tracks was the damaged part of the road that caused the accident."

In support of William's liability assertions against NJT, his expert Andrew Ramisch conducted a professional engineering analysis of the condition of the roadway surface in the area where William lost control of his bicycle. Ramisch's report states:

> The photographs . . . taken . . . the day following the incident . . . show a defect in the surface of the roadway . . . of sufficient size to throw a bicycle out of control by the operator. . . . The [NJT] officials responsible for the maintenance of Whiten[a]ck Road at the [NJT] railroad track should have had actual or constructive knowledge that the unreasonably dangerous condition of the roadway surface presented bicyclists with a hazard capable of causing harm.

Ramisch further opined:

- "At the time of [William's] accident, there was an irregularity in the roadway surface at the crossing [where he reportedly fell]."

- "The deteriorated asphalt surface created a dangerous condition of public property that caused

---

[3] Marked for identification purposes as BNS-3.

> [William] to lose control of his bicycle and to fall .
> . . ."
>
> - "Had [NJT] promptly repaired Whiten[a]ck Road
>   before the date of this incident, the chances of
>   [William] being injured would have been reduced
>   virtually to nil."

William also retained cycling expert Lester Leatham, who authored a report stating bicyclists are legally entitled to go as fast as they are comfortable riding, up to the speed limit, and since there was no posted speed limit sign on the road, the speed limit was fifty miles per hour. Leatham's report further details signage on the road stating photos taken after the accident show an "advisory sign indicating, 'BUMP' . . . , supplemented by an advisory speed plaque . . . indicat[ing] a speed of [ten miles per hour]." Leatham maintained advisory signs "are <u>not</u> regulatory signs and do <u>not</u> indicate speed limit established by ordinance. The speed posted on an advisory plaque is a speed recommendation, used when it may not be obvious to a driver that a safe speed is below the speed limit." After reviewing bicycling best practices and behavior, Leatham opined William was riding safely and reasonably and the poor condition of the tracks was the major contributor to his accident.

A-4308-18T3

B. Railroad Track Maintenance

NJT Hoboken Line Engineer David Lobyocz was deposed regarding maintenance of the railroad crossing. Lobyocz testified exhibits of pictures of the crossing depicted the condition of the asphalt surrounding the rails as "basically mostly intact[,]" with "some small gaps" and "[a] small amount of erosion." However, Lobyocz stated he could not tell how long the condition had existed, what caused it, or whether NJT was notified about it. He believed the condition could be the result of weather, traffic, or other causes.

Regarding NJT's inspection procedures, Loboycz stated "[o]ur track is inspected once a week by track inspectors. . . . It's not a specific inspection for a crossing. . . . [T]hey'll inspect the entire line from Point A to Point B, and the crossing would be included as every other crossing would be included." Loboyocz indicated after a rail is inspected an inspection form is filled out whether any repairs are warranted, and those reports are retained for two years pursuant to Federal Railroad Administration regulation.

When asked whether NJT should have an inspection report for the Whitenack crossing at the time of the incident, Loboyocz indicated he did not believe a report was available. He stated he inquired about the records to a track supervisor who told him they were not retained. During the deposition,

Loboyocz was given a logbook which referenced an incident involving a train at the crossing. He stated the first logged incident at the crossing is dated July 1, 2013, around twenty-two months before William's accident, and the date of the next logged incident was September 29, 2015, more than four months after William's accident.

Loboyocz indicated the primary purpose of the inspections are to maintain the safe passage of trains, but that "everything would be taken into consideration as far as if it was deemed unsafe" including pedestrians, cyclists and cars. When addressing defects in the asphalt at rail crossings, he stated NJT waits for a phone call, "either a complaint from customer service or sometimes the state Department of Transportation would say, 'you should patch this crossing,' and we would have the guys go out with some cold patch and fill in any hole that was . . . a problem."

C. The Bonsall's Marital Relationship

William and Sheri were married and living together at the time of the accident, but they separated a year and four months afterwards in September 2016. After their former marital home was sold, Sheri moved to Florida in April 2017. She later returned New Jersey in May or June of 2018 but continues to live separately from William.

II.

On March 6, 2019, the motion judge issued orders granting NJT and Bernardsville[4] summary judgment and dismissing the Bonsalls' complaint in its entirety with prejudice. The order was accompanied by a sixty-page written opinion.

In the opinion, the judge explained that given NJT's status as a public entity, Muhammad v. N.J. Transit, 176 N.J. 185, 188 (2003), NJT was not liable for Williams' bike accident under N.J.S.A. 59:4-2. The statute provides:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition

---

[4] The order granting summary judgment to Bernardsville is not being appealed; thus, it is not discussed in this opinion.

of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

[Ibid.]

Citing Vincitore v. Sports & Exposition Auth., 169 N.J. 119, 125 (2001), the judge determined the Bonsalls did not establish a prima facie case of dangerous condition liability under N.J.S.A. 59:4-2 by proving the following five elements:

> 1. . . .The existence of a physical defect which creates a substantial risk of injury to all persons when the property is used with due care in a foreseeable manner. N.J.S.A. 59:4-2; N.J.S.A. 59:4-1(a).
>
> 2. . . . Notice that the alleged defect existed is not sufficient; plaintiff must prove that the public entity had:
>
> (a) notice of its dangerous character; and
>
> (b) actual or constructive notice of the dangerous condition in sufficient time prior to the inquiry to protect against the dangerous condition; or any employee of the public entity acting within the scope of his/her employment either created the dangerous condition, or by his/her inaction, allowed the dangerous condition to be created. N.J.S.A. 59:4-2; N.J.S.A. 59:4-1(b); N.J.S.A. 59:4-3.
>
> 3. . . . The defect proximately caused plaintiff's injury. N.J.S.A. 59:4-2.

A-4308-18T3

4. . . . The kind of injury plaintiff sustained was a reasonably foreseeable risk of the condition. N.J.S.A. 59:4-2.

5. . . . [T]he action or inaction of the public entity in respect to its effort to protect the condition of the property was palpably unreasonable. That standard has been described to be conduct that is outrageous, arbitrary or obviously without reasonable basis.

Regarding the first, third, and fourth elements, the judge found the Bonsalls failed to produce evidence "with any reasonable certainty and specificity" of a dangerous condition which caused William's fall and injury. The judge reasoned Krueger's identification of the alleged "defect was speculative, at best," given it was three years after the accident and he was riding some thirty yards behind William. The judge did not discuss the Bonsall's experts' reports and noted William himself "could not identify the spot" on the railroad tracks that caused his fall.

Regarding the second element, the judge found the Bonsalls presented no competent evidence which would enable a jury to find NJT had actual or constructive notice of the alleged defect. As to actual notice, the judge pointed out there was no evidence anyone employed or supervised by NJT saw or was aware of any alleged defect at the crossing, and there was no inference of actual notice based on NJT's weekly inspections. Regarding constructive notice, the

court found nothing in the record indicated the length of time the alleged condition existed before William's accident, thus there could be no inference of constructive notice that NJT "should have or must have seen the dangerous condition because [it] made regular and periodic inspections." In support, the judge cited to <u>Polzo v. Cty. of Essex</u>, 196 N.J 569, 581 (2008), where our Supreme Court held the "mere existence of an alleged dangerous condition is not constructive notice of it."

The judge also found the Bonsalls failed to prove NJT's conduct was palpably unreasonable as required by the fifth element. Citing <u>Coyne v. N.J. Dep't of Transp.</u>, 182 N.J. 481, 493 (2005), the judge noted generally the plaintiff has the burden to prove palpable unreasonableness as an element to establish dangerous condition liability under N.J.S.A. 59:4-1 to -3, whereas the defendant has the burden to prove an exception to discretionary immunity under N.J.S.A. 59:2-3(d). As NJT had not raised discretionary immunity, the judge found the onus was on the Bonsalls to prove palpable unreasonableness. The judge determined because the Bonsalls could not indicate, without speculation, the exact defect which caused the accident, or how long it had existed, they were unable to demonstrate NJT failed to exercise due care and its conduct was palpably unreasonable in not detecting and correcting the dangerous condition.

13

The Bonsalls filed a motion for reconsideration which the judge denied in an April 26, 2019 order, setting forth his reasons in a written decision. For the most part, the judge cited a substantial amount of his summary judgment decision. The judge rejected the Bonsalls argument the summary judgment order invaded the jury's province by incorrectly deciding there was not a dangerous condition on the railroad tracks in contravention of Kreuger's deposition testimony and the expert opinion of Leatham. The judge reiterated his ruling the Bonsalls failed to prove a dangerous condition caused William's accident by reiterating Krueger's account – the lone eyewitness given William could not recall how he fell – was insufficient given that during his deposition he twice speculated the deteriorating pavement was the dangerous condition which caused the accident. The judge noted the Bonsalls' experts never conducted their own inspections to determine the cause of the accident nor did they reconcile their opinions with Kreuger's testimony or take into consideration the speed William was travelling at the time of the accident.

Regarding actual or constructive notice of a dangerous condition, the judge rejected the Bonsalls' contention he failed to consider NJT's weekly inspections and the obvious erosion around the railroads tracks as evidenced by photos of the accident area which could allow a jury to infer notice on NJT. The

14

judge held the contention was speculative because the proofs could not confirm when and how long the alleged dangerous condition existed, therefore the Bonsalls' could not satisfy their burden of proving a prima facie case of dangerous condition liability.

Finally, the judge pointed out the Bonsalls did not address his ruling that they did not prove NJT's failure to correct the alleged dangerous condition was palpably unreasonable, therefore his decision should not be reconsidered as incorrect.

This appeal ensued.

### III.

We review a ruling on a summary judgment motion de novo, applying the same standard governing the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017) (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). Thus, we consider, as the motion judge did, "whether 'the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Holmes v. Jersey City Police Dep't, 449 N.J. Super. 600, 602-03 (App. Div. 2017) (citation omitted) (quoting Brill v. Guardian Life Ins. Co. of Am.,

142 N.J. 520, 540 (1995)). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

The Bonsalls contend summary judgment was not proper because there were genuine issues of material fact regarding the existence of a dangerous condition of deteriorated asphalt around NJT's railroad, which under N.J.S.A. 59:4-2 made NJT liable for William's accident. They also contend summary judgment was not proper because, in accordance with N.J.S.A. 59:4-2 and N.J.S.A. 59:4-3, they established the dangerous condition of deteriorated asphalt around NJT's railroad was the proximate cause of William's accident, and NJT had notice of the defect but its failure to properly maintain the crossing and eliminate the defect was palpably unreasonable.

The fundamental principles embodied in the TCA include the notion that governmental immunity is the rule unless the Act itself creates an exception. Kepler v. Taylor Mills Developers, Inc., 357 N.J. Super. 446, 453 (App. Div.

16

2003). As we have also said, in enacting the TCA "[t]he Legislature had rejected the concept of a statute that imposed liability with specific exceptions . . . . [Instead], public entities are immune from liability unless they are declared to be liable by enactment." Macaluso v. Knowles, 341 N.J. Super. 112, 117 (App. Div. 2001) (second and third alterations in original). Of necessity, a public entity must retain the power and discretion to determine how to allocate scant resources. Suarez v. Dosky, 171 N.J. Super. 1, 9 (App. Div. 1979).

N.J.S.A. 59:4-2 states a public entity is liable if a plaintiff establishes: (1) "public property was in a dangerous condition at the time of the injury;" (2) "the injury was proximately caused by the dangerous condition;" (3) "the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred;" and (4) "a negligent or wrongful act or omission of [a public] employee . . . created the dangerous condition;" or "a public entity had actual or constructive notice of the dangerous condition . . . ." Additionally, a public entity is not liable for a dangerous condition of its property if "the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable." Ibid. The claimant has the burden to prove the public entity's action or inaction was palpably unreasonable. Coyne, 182 N.J. at 493.

17

A. Existence of Dangerous Condition

The TCA defines "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1(a). Our jurisprudence regarding whether a condition of public property is in a dangerous condition does not illuminate, as a matter of law, whether the condition plaintiffs complain of meets the standard. Therefore, "the critical question . . . is whether a reasonable factfinder could have concluded that plaintiff demonstrated that the property was in a 'dangerous condition.'" Vincitore, 169 N.J. at 124.

Based "under [our] indulgent summary-judgment standard of review," Polzo, 209 N.J. at 75, in which the record must be viewed in the light most favorable to the Bonsalls, we disagree with the motion judge that they did not establish sufficient proof the dangerous condition of deteriorated asphalt surrounding the railroad tracks caused William's accident. Although the Bonsall's evidence, primarily based on Krueger's recollection of the accident, is open to credibility attack, for summary judgment purposes we must accept it instead of discounting it as the judge appeared to do.

A-4308-18T3

Kreuger testified William wobbled on his bicycle and fell immediately after crossing the railroad tracks. Kreuger was able to identify the exact location of William's fall and defects in the road which he logically concluded caused William's accident. The Bonsalls' expert witnesses also opined the defect was "of sufficient size to throw a bicycle out of control" and "the poor condition of the tracks was the major contributor to the crash." Further, NJT's Engineer, Lobyocz, testified to seeing "some small gaps" and "[a] small amount of erosion" around the railroad tracks. He further indicated that while the primary purpose of the railroad inspections is to maintain the safe passage of trains, "everything would be taken into consideration as far as if it was deemed unsafe" including pedestrians, cyclists and cars.

We disagree with the judge that the Bonsalls did not establish sufficient proof the dangerous condition of deteriorated asphalt surrounding the railroad tracks caused William's accident. The judge's determination that Kreuger's testimony was only speculative based on his seemingly inconsistent deposition statements regarding the exact defect which caused William's accident is a credibility determination to be made by a finder of fact and not a legal determination made by a judge on a summary judgment motion. Accepting the facts in the light most favorable to the Bonsalls, they have demonstrated William

was riding his bicycle with due care on a public roadway where it was foreseeable he would be riding when he encountered a dangerous condition which caused his accident and injuries. Therefore, the Bonsalls have shown a reasonable jury could find a dangerous condition existed under the TCA.

We would also agree if the Bonsalls established a dangerous condition existed at the time of William's accident, a jury could similarly conclude the dangerous condition was the proximate cause of his accident and created a reasonably foreseeable risk of the kind of injuries he sustained. See Daniel v. N.J. Dep't of Transp., 239 N.J. Super. 563, 595 (App. Div. 1990) (quoting Polyard v. Terry, 160 N.J. Super. 497, 511 (App. Div. 1978)) ("Proximate cause is 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'").

There is no evidence in the record there was any superseding factor which led to William losing control of his bicycle. Likewise, as the Bonsalls provided evidence that William was riding his bicycle with due care, it would also be a question for a jury whether the complained of dangerous condition created a reasonably foreseeable risk he would crash and become injured.

B. Notice of Dangerous Condition

Turning to the requirement the Bonsalls had to prove notice of the dangerous condition to sustain liability against NJT, we agree with the judge they fell short in doing so. Therefore, dismissal of their complaint was proper.[5] There is little doubt there was no proof NJT had actual notice of the dangerous condition which caused William's accident. Thus, the Bonsalls stress NJT had constructive notice of the dangerous condition.

Constructive notice of a dangerous condition by a public entity under N.J.S.A. 59:4-2 occurs "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b).

There are various ways a plaintiff can demonstrate constructive notice. The appearance of the dangerous condition can show constructive notice. See, e.g., Chatman v. Hall, 128 N.J. 394, 418 (1992) (finding the size of a pothole

_____

[5] While a plaintiff can alternatively establish a cause of action under N.J.S.A. 59:4-2 by showing an employee of a public entity created the condition complained of, N.J.S.A. 59:4-2(a), the Bonsalls do not argue this theory, which has otherwise been precluded under the factual scenario presented. See Polzo, 209 N.J. at 66 (finding public entities do not create a dangerous condition under N.J.S.A. 59:4-2(a) by inadequately inspecting its property).

can indicate it existed long enough that a public entity may have had constructive notice of its existence); Lodato v. Evesham Twp., 388 N.J. Super. 501, 505-04, 512 (App. Div. 2006) (holding whether the defendant township had constructive notice was a question for a jury when the pedestrian plaintiff tripped and fell due to a defect on a sidewalk which had been in existence for at least eighteen years); Milacci v. Mato Realty Co., Inc., 217 N.J. Super. 297, 302-03 (App. Div. 1987) (finding a large accumulation of dirt and sand on the floor of an office can indicate a public entity may have had constructive notice of its existence). Additionally, prior accidents at the same location of the dangerous condition can create an issue of fact as to constructive notice. Wymbs v. Twp. of Wayne, 163 N.J. 523, 536 (2000). Nonetheless, our Supreme Court has determined, as a matter of public policy, injured bicycle riders seeking relief under the TCA face a higher standard to prove a defendant had notice of a defective condition on a public roadway lacking bicycle lanes. See Polzo, 209 N.J. at 71-72.

For the reasons substantially stated by the judge in his written opinion, we reject the Bonsalls' contention that NJT had constructive notice of the dangerous condition that caused William's accident. We add the following.

Like in <u>Polzo</u>, and unlike in <u>Chatham</u>, <u>Lodato</u>, <u>Milacci</u>, and <u>Monaco</u>, the Bonsalls have not presented any evidence the area in question was primarily intended for bicycle riding. To the contrary, Lobyocz testified the primary purpose of the rail inspections are to maintain the safe passage of trains, although "everything would be taken into consideration as far as if it was deemed unsafe" including pedestrians, cyclists and cars. Similar to the plaintiff in <u>Polzo</u>, the Bonsalls have not presented any recognized or established standard for determining when a road condition at a railroad crossing presents a dangerous condition when used for its generally intended purpose. They offered no evidence the shoulder of the road where the accident took place was designated as a bicycle lane. Even though William and Kreuger testified to riding their bicycles over the tracks several times prior to the accident, they reported no prior accidents, and there was no evidence any other person had complained of the road condition prior to the accident. Because the defect was at a public railroad crossing whose primary purpose is to allow the passage of trains and motor vehicles, constructive notice cannot be inferred when William was riding a bicycle without proof the dangerous condition could have also caused injury to those travelling by car or rail. Furthermore, no competent

23

evidence was presented indicating the length of time that erosion around the railroad track existed.

C. Palpably Unreasonable Conduct in Eliminating Dangerous Condition

Given our conclusion NJT did not have actual or constructive notice of the dangerous condition which caused William's accident, the agency's failure to repair it cannot be viewed as palpably unreasonable under the TCA.[6] "The mere '[e]xistence of an alleged dangerous condition is not constructive notice of it.'" Arroyo v. Durling Realty, LLC, 433 N.J. Super. 238, 243 (App. Div. 2013) (alteration in original) (quoting Sims v. City of Newark, 244 N.J. Super. 32, 42 (Law Div. 1990)). It therefore follows, absent actual or constructive notice, the public entity cannot have acted in a palpably unreasonable manner. See Maslo v. City of Jersey City, 346 N.J. Super. 346, 350-51 (App. Div. 2002).

Yet, even if we conclude there was actual or constructive notice of the dangerous condition, the Bonsalls have not presented any facts showing NJT's conduct was palpably unreasonable. Apart from proof of notice, to establish

---

[6] The Bonsalls failed to prove either the dangerous condition was caused by an act or omission of an NJT employee or NJT had actual or constructive notice of the dangerous condition. Polzo, 209 N.J. at 66-67 (a public entity's inadequate inspection of property does not affirmatively create a dangerous condition which would allow a cause of action under N.J.S.A. 59:4-2 upon finding the entity lacked actual or constructive notice).

liability against a public entity under N.J.S.A. 59:4-2, a claimant must establish a prima facie case that the action or inaction of the public entity was "palpably unreasonable." Coyne, 182 N.J. at 493; Maslo, 346 N.J. Super. at 349. Similarly, N.J.S.A. 59:2-3(d) provides,

> A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable.

"[The] subsection incorporates the thesis that once resources have been provided a public entity may be liable for its determination of priorities in the application of such resources if that determination is palpably unreasonable." Margolis & Novack, Claims Against Public Entities, 1972 Task Force Comment on N.J.S.A. 59:2-3(d) (2020). "Broadly speaking [N.J.S.A.] 59:2-3 provides that there shall be no liability for the decision-making process of public entities." Margolis & Novack, cmt. 1 on N.J.S.A. 59:2-3.

Palpable unreasonableness implies "'behavior that is patently unacceptable under any given circumstance.'" Polzo 209 N.J. at 75 (citing Muhammad, 176 N.J. 185, 195–96). "When a public entity acts in a palpably unreasonable manner, it should be 'obvious that no prudent person would approve

of its course of action or inaction.'"  Id. at 76 (citing Muhammad, 176 N.J. 185, 195–96).  Said another way, palpably unreasonable conduct "implies a more obvious and manifest breach of duty" than negligence, "and imposes a more onerous burden on the plaintiff."  Williams v. Town of Phillipsburg, 171 N.J. Super. 278, 286 (App. Div. 1979).

Whether the public entity's behavior was palpably unreasonable is generally a question of fact for the jury.  See Vincitore, 169 N.J. at 130. However, a determination of palpable unreasonableness, "like any other fact question before a jury, is subject to the court's assessment whether it can reasonably be made under the circumstances presented."  Maslo, 346 N.J. Super. at 351 (quoting Black v. Borough of Atl. Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993)).  Accordingly, "the question of palpable unreasonableness may be decided by the court as a matter of law in appropriate cases."  Id. at 350 (citing Garrison v. Twp. of Middletown, 154 N.J. 282, 311 (1998)).

The record in this case convinces us, as a matter of law, NJT's actions pertaining to the failure to repair the erosion around the railroad track was not palpably unreasonable.  There is no dispute NJT's inspection of its railroads tracks was a discretionary activity.  Given the limited resources of public entities, it is not within our power to impose a more comprehensive pothole

inspection and repair program on NJT.  See Polzo, 209 N.J. at 69.  As noted,
there was no reported concern of asphalt deterioration around the railroad tracks
where William's accident occurred.   There was no proof NJT's inspection
program was unreasonable.  Under these circumstances, no rational factfinder
could find it was palpably unreasonable for NJT not to have repaired the asphalt
deterioration which caused William's unfortunate injury.

IV.

Given our conclusion it was proper to dismiss the Bonsalls' complaint on
summary judgment because they failed to show NJT had actual or constructive
notice of the dangerous condition which caused William's accident and failed to
show NJT was palpably unreasonable in failing to repair it, it is not necessary
to address the summary judgment dismissal of Sheri's loss of consortium claim
as it is derivative of William's liability contention against NJT.[7]  See Weir v.
Mkt. Transition Facility of N.J., 318 N.J. Super. 436, 444 (App. Div. 1999)
(citing Tichenor v. Santillo, 218 N.J. Super. 165, 173 (App. Div. 1987)) (holding
a derivative claim can rise no higher than the personal injury claim of the other
spouse).  However, for the sake of completeness, had we reversed the motion

---

[7]  The motion judge's written decision did not specifically address Sheri's claim.
We presume it was because his ruling the Bonsalls failed to establish liability
against NJT effectively precluded her claim.

judge's ruling by reinstating William's claim against NJT, the same would have applied to Sheri's claim despite their continued separation beginning a little more than a year after the accident.

The Bonsalls allege William's severe injuries from the accident took a toll on Sheri's quality of life, and unfortunately strained their marriage. Thus, accepting these allegations as true for the purpose of determining summary judgment does not preclude Sheri's per quod claim. The Bonsalls' separation does not, as NJT contends, bar her claim. In fact, depending on the proofs, a factfinder could have awarded her damages due to the impact of William's accident on their marriage. Yet, because we conclude the Bonsalls cannot establish labiality against NJT under the TCA, Sheri cannot pursue her claim at trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4308-18T3