**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0999-22

WILLIAM FULMORE,

     Plaintiff-Appellant,

v.

CITY OF ENGLEWOOD,
CITY OF ENGLEWOOD
DEPARTMENT OF PUBLIC
WORKS, JAMES FEDORKO,
DARIA TRUMPET, and
EDROY JENKINS,

     Defendants-Respondents.

_____

Submitted January 17, 2024 – Decided August 30, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Civil Division, Bergen County, Docket No. L-2619-20.

Law Office of Eric J. Warner, LLC, attorney for appellant (Eric J. Warner, of counsel and on the briefs).

Hanrahan Pack, LLC, attorneys for respondents (David J. Pack, of counsel and on the brief).

PER CURIAM

Plaintiff William Fulmore appeals from the October 28, 2022, Law Division order granting summary judgment dismissal of his complaint against defendants City of Englewood (City), City of Englewood Department of Public Works (DPW), James Fedorko, the City's Health Officer, Daria Trumpet, the City's Director of Human Resources, and Edroy Jenkins, DPW's Superintendent. In his complaint, plaintiff, a DPW employee and shop steward, alleged civil rights violations pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, a civil conspiracy in violation of 42 U.S.C. § 1985, and retaliation in violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. Plaintiff alleged defendants violated his rights by making disclosures to his pastor about his quarantine status in connection with the COVID-19 pandemic. We affirm.

I.

We derive the following facts from evidence the parties submitted in support of and opposition to the summary judgment motion, "giv[ing] the benefit of all favorable inferences to plaintiff[]." Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

Plaintiff began working for the City as a DPW laborer in 2004, and became DPW's Chief Shop Steward in 2013. In that role, among other responsibilities, plaintiff acted as the "middleman between the [C]ity and the union," and filed "any grievances that the employees ha[d]."

According to plaintiff's complaint, when the COVID-19 pandemic began in March 2020, plaintiff complained to Jenkins that DPW was not providing its employees with "proper safety equipment and was not properly isolating/quarantining the employees." Plaintiff also raised his concerns with Trumpet, who advised plaintiff to write to the City Manager.

As a result, on March 19, 2020, plaintiff emailed Jewel Thompson-Chin[1] to express his concerns:

> My name is William Fulmore, Chief Shop Steward from the [DPW] in Englewood. Over the last two weeks I have been expressing my concern about quarantining the [DPW]. Day after day the problems are growing worse in this country especially in the City of Englewood. On March 17, 2020[,] at 4[:00 ]p.m. Bergen County issued positive cases in the municipalities and Englewood at the time had [twelve] people who tested positive for the virus. Today it[ is] March 19 so I know the number has changed by now. I feel the City of Englewood [has] failed to protect the

---

[1] In his merits brief, plaintiff identifies the City Manager as "[d]efendant[] Raymond Romney." However, Romney is neither a named defendant, nor does he appear to be the City Manager. Jewel Thompson-Chin to whom defendant sent his correspondence is not a named defendant.

A-0999-22

DPW employees from [COVID].  Instead the City's version of quarantine is to work through lunch and leave at 2[:00].  Out of all the departments in the [C]ity of Englewood we[ are] more exposed to bacteria. World News reported [COVID] lasts [three] hours in the air, it lasts [four] hours on copper surfaces, [twenty-four] hours on cardboard, and [two to three] days on plastic and stainless steel.  Yesterday was recycling and we were dealing with cardboard pickup and plastic pickup.  If [twelve] or more people [are] infected with [COVID] in the City of Englewood, then DPW employees w[ere] exposed to the virus.

I do[ not] understand how the City of Englewood has done nothing to protect the employees at DPW.  We understand garbage has to be picked up, and we have no problem picking it up.  All we[ are] asking for is once the garbage and recycling is picked up the City would allow the employees to go home and quarantine ourselves.  This is a pandemic and it[ is] only getting worse.  It seems like the City is[ not] going to be satisfied until someone here becomes infected and spreads it to someone else.  So far we have no known cases and we would like to keep it that way.  I know we pick[]up garbage and it may not be glorified, but please do[ not] treat us like what we pick[ ]up.  I am a father, I am a husband, I have two beautiful daughters ages [seven] and [five].  The last thing I want to do is go home and spread the virus to them because the City failed to quarantine this Department.  I[ am] asking everyone who is making decisions over our lives to strongly reconsider, and allow these men to go home when all the work is completed.

If the City feels working DPW employees from 7[:00] am to 2[:00] pm with no lunch is a method of quarantine, I will request the City send out a memo on

4

[C]ity letterhead stating this is the best method to quarantine.

I hope you will reconsider the working hours for now and adjust them to protect the workers and their families.

On the same day, Thompson-Chin replied:

I[ am] in receipt of your email concerning work and health concerns for DPW employees. We are aware of these issues and . . . we will work closely with you [to] address some [of] the issues that you have raised. Please note that I[ have] copied Jim Fedorko, Health Officer, for follow up, since we have been reviewing methods for improving the safety and protection for DPW employees.

I have stressed the need for training and protective gear given the types of jobs and assignments that are handled by the Department.

While DPW employees are not classified as administrative or law enforcement, they clearly fall within the category of public safety, and are therefore considered essential employees during states of emergency; and are expected to work a normal schedule. This makes meeting the needs for protection a very high priority for the City.

One of the steps we are taking with other civilian and essential employees is to reach out to surrounding municipalities to research any operational procedures related to [the] current health crisis. Please advise us, if [you] have any specific proposals. In the meantime, . . . Fedorko will follow up with . . . Jenkins to

A-0999-22

recommend any additional safety practices which should be immediately adopted.[2]

In a deposition, Fedorko testified that under the policy in place at the time, if any "individual employees . . . were identified as close contacts with positive [COVID] patients, . . . they had to be quarantined." Pursuant to the policy, employees who tested positive were "required to quarantine or isolate[.] . . . ten days from test result or ten days from symptom onset." On March 29, 2020, Trumpet informed plaintiff that a DPW employee had tested positive for COVID. Because plaintiff had driven the same truck as the employee, plaintiff was told he "had potentially been exposed, and . . . should quarantine" and refrain from coming to work from March 29 until April 9, 2020.

The following day, March 30, 2020, while plaintiff was out on quarantine leave, Trumpet and Jenkins met with DPW employees to discuss COVID-related concerns. Plaintiff joined the meeting via FaceTime and remained for the "entire meeting." The next day, March 31, 2020, when Trumpet called plaintiff to check in, plaintiff informed her that he was "showing no symptoms," but his father had tested positive for COVID, and he had driven his father to the hospital. Trumpet immediately notified Fedorko of the conversation.

---

[2] We made stylistic changes to the block quote for ease of reading because the original text contains several mid-sentence line breaks.

A-0999-22

Fedorko testified in his deposition that shortly after his conversation with Trumpet, he called plaintiff to talk about plaintiff's additional exposure to COVID and explained that plaintiff's quarantine would be extended for several more days. According to Fedorko, he then wrote a letter memorializing the conversation but did not send it to plaintiff. In his deposition, however, plaintiff denied being contacted by Fedorko until April 10, 2020.

On April 5, 2020, while plaintiff was still in quarantine, plaintiff participated in an in-person recording of the "Last Seven Words" service at the Community Baptist Church where he had been a licensed Associate Minister since 2009. The service would be posted online on April 10, 2020, for Good Friday. Approximately ten other congregants attended the recording. Plaintiff did not tell the attendees he was instructed to quarantine. According to plaintiff, at the time, he thought that quarantine "simply [meant] do[ not] go to work," but he could "go anywhere else" he wanted.

When the recording of the service was posted for viewing on April 10, 2020, Trumpet, who was also a parishioner at the church, watched the service and was "stunned" to see plaintiff participating in the recording knowing that "he was supposed to be in quarantine" at the time it was recorded. In her deposition, Trumpet testified that she knew the service was recorded beforehand

7

because of prior church announcements. She also confirmed with a friend that it was recorded "prior to" April 9, 2020. After the recording aired, Trumpet and Fedorko discussed the fact that plaintiff "was at the church . . . when he was supposed to [be] quarantined." Additionally, Jenkins had previously told Fedorko about "rumors that [plaintiff was] breaking his quarantine." For instance, plaintiff had reportedly been seen at ShopRite.

On the same day that the service aired, April 10, 2020, Fedorko contacted plaintiff and advised him that he was "still under quarantine" until the following Monday. During the conversation, Fedorko explained to plaintiff that "quarantine meant you[ are] not allowed to go to ShopRite," "[you are n]ot allowed to go to church," and "[you are] not allowed to have visitors." Plaintiff's account of the conversation with Fedorko differed. According to plaintiff, when he asked why he was being quarantined when no one else at DPW was quarantined, Fedorko said "'[j]ust in case something w[ere] to happen, the City did[ not] want a problem.'" Plaintiff believed Fedorko was referring to the fact that plaintiff had previously filed a lawsuit against the City and DPW. Plaintiff also alleged that during the conversation, Fedorko told him he could not preach, an allegation Fedorko denied.

8

On the same day, Fedorko called Pastor Taylor, plaintiff's pastor at the Community Baptist Church, and informed him that plaintiff was in quarantine after being identified as a close contact. Fedorko testified that he had previously contacted Pastor Taylor regarding "other [COVID] incidences that happened in the church." Fedorko stated "almost every rabbi and pastor in town" was contacting him to inquire about handling COVID. Fedorko decided to contact Pastor Taylor because "if [plaintiff] was asymptomatic, then he would get everyone in . . . the church sick." Fedorko acknowledged however that at the time, he did not know "if [plaintiff] was [positive]" for COVID-19.

Later that night, plaintiff received the following text message from Pastor Taylor:

> Minister [Fulmore], I received a disturbing phone call today from your supervisor at work informing me that when we recorded . . . the [S]even [L]ast [W]ords service, you were ordered to be self[-]quarantine[d] because you were exposed to COVID by a co-worker. According to [Fedorko], . . . your quarantine ended today. If this is so, I wonder why you would jeopardize others by ignoring this order. I can[not] imagine what the other ministers will say when they realize that perhaps they were potentially exposed. As leaders of the gospel we must be examples to all. Those who work with you and saw you on our worship today now question the validity of your call and concern for others. This was not a good move on your behalf. Instead, it was careless and [reckless]. Death is real and people

A-0999-22

are dying from COVID 19.  We must help guard others and ourselves.

. . . .

I think if you are told to stay home, that also means stay away from other people given the uncertainties about this virus.

. . . .

. . . .  My mother-in-law was diagnosed with COVID and died.  We have lost [three] additional members to the disease and many are sick.  Had we been ordered in by anyone, I would have said something just to let folk[s] know. . . .  I[ am] just telling you that you should have said something to me . . . .[3]

Plaintiff alleged that Fedorko later called him on April 12, 2020, and told him he "did not fit the pattern to be quarantined for [fourteen] days from work." According to plaintiff, Fedorko also stated that the decision to quarantine him was not Fedorko's decision.  Fedorko denied both statements.  Plaintiff further alleged that because defendants' quarantine policy differed for different DPW employees, including employees who actually tested positive and employees who had direct close contact with employees who tested positive, he submitted a complaint to the U.S. Department of Labor Occupational Safety and Health

---

[3] Once again, we made stylistic changes to the block quote for ease of reading.

Administration (OSHA) regarding defendants "ordering and/or requiring infected workers who are still experiencing symptoms of COVID-19 to return to work and not quarantining the other employees at the DPW."

On May 4, 2020, plaintiff filed a four-count complaint alleging that defendants: 1) violated his federal and state constitutional rights to privacy and the free exercise of religion; 2) unlawfully retaliated against him in violation of CEPA; and 3) engaged in a civil conspiracy to deprive him of his constitutional rights. In the complaint, plaintiff alleged that as a direct result of defendants' decision to quarantine him and disclose to his pastor that he was a close contact to a worker who tested positive, plaintiff "has not been allowed to preach at his [c]hurch and has not been otherwise free to exercise his religious beliefs." He further asserted that "no other DPW employees who have come into direct contact with [COVID-positive employees] have been ordered to self-quarantine like [d]efendants ordered [p]laintiff to self-quarantine." He alleged that defendants engaged in "retaliatory conduct" after "[p]laintiff complained about . . . [defendants'] violations of the law." Among other things, he seeks compensatory and punitive damages.

Defendants moved for summary judgment. Plaintiff opposed the motion and cross-moved for partial summary judgment. On October 28, 2022,

following oral argument, the motion judge entered an order granting defendants' motion and dismissing plaintiff's complaint with prejudice. In an oral decision on the record, the judge found "no evidence" to "indicate[] that . . . Fedorko and . . . Trumpet" conspired against plaintiff. The judge reasoned that defendants were "simply trying to do their job during a worldwide pandemic where everything was in a state of flux."

Specifically, regarding plaintiff's privacy claim, the judge found "there was no medical condition revealed," and Fedorko's disclosure was "for the purposes of [contact] tracing." Turning to plaintiff's free exercise of religion claim, although plaintiff might have experienced "embarrassment" from defendants notifying Pastor Taylor, the judge discerned "no evidence" that the City "inhibited him from freedom of exercise of his Christian religious beliefs."

Finally, regarding plaintiff's CEPA claim, the judge determined that plaintiff suffered no "adverse consequence" as he "was[ not] docked pay," "denied a promotion," or "demoted." Further, plaintiff did not have any "benefits" or "vacation days" taken away and did not have a "negative letter put in his personnel file." In other words, according to the judge, besides potential "embarrassment with the church," plaintiff "was[ not] otherwise harmed."

12

Therefore, the judge concluded "there [was] just not a shred of evidence" that rose to the level of a statutory or constitutional violation. This appeal followed.

On appeal, plaintiff raises the following points for our consideration:

> POINT I: THIS COURT SHOULD OVERRULE THE [TRIAL] COURT['S] GRANT OF SUMMARY JUDGMENT TO DEFENDANTS BECAUSE DEFENDANTS VIOLATED [PLAINTIFF'S] CONSTITUTIONAL RIGHT TO PRIVACY AND NUMEROUS QUESTIONS OF FACT REMAIN.
>
> POINT II: THIS COURT SHOULD OVERRULE THE [TRIAL] COURT'S GRANT OF SUMMARY JUDGMENT TO DEFENDANTS AND GRANT SUMMARY JUDGMENT TO [PLAINTIFF] BECAUSE DEFENDANTS ADMITTED TO INTERFERING WITH [PLAINTIFF'S] CONSTITUTIONAL RIGHT TO PRACTICE HIS RELIGION IN THEIR OFFICIAL CAPACITY.
>
> POINT III: THIS COURT SHOULD OVERRULE THE [TRIAL] COURT'S GRANT OF SUMMARY JUDGMENT TO DEFENDANTS AND GRANT SUMMARY JUDGMENT TO [PLAINTIFF] ON THE ISSUE OF CIVIL CONSPIRACY BECAUSE DEFENDANTS ADMITTED TO ENGAGING IN A CIVIL CONSPIRACY.
>
> POINT IV: THIS COURT SHOULD OVERRULE THE [TRIAL] COURT'S GRANT OF SUMMARY JUDGMENT TO DEFENDANTS ON [PLAINTIFF'S] CEPA CLAIM, WHERE THE [TRIAL] COURT ERRED BY, INTER ALIA, MAKING FINDINGS OF FACT THAT [PLAINTIFF] SOMEHOW DID NOT SUFFER RETALIATION.

    A.    [Plaintiff] Engaged In Whistleblowing Under CEPA.

    B.    [Plaintiff] Was The Subject Of Any Adverse Employment Actions.

    C.    Plaintiff Has Established A Causal Connection Between His Whistleblowing And The Adverse Employment Action.

POINT V: THIS COURT SHOULD OVERRULE THE [TRIAL] COURT'S DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PERMIT [PLAINTIFF'S] CLAIM FOR PUNITIVE DAMAGES [TO] GO TO A JURY.

POINT VI:  THIS COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE NUMEROUS ISSUES OF MATERIAL FACT, AND THE CONSTITUTIONAL RIGHTS VIOLATION ISSUES WARRANT AT LEAST PARTIAL SUMMARY JUDGMENT IN FAVOR OF [PLAINTIFF] ON THESE ISSUES AS A MATTER OF LAW.

II.

"[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court."  Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).  That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the

14

> non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill[, 142 N.J. at 540]. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, 142 N.J. at 540.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016).]

Where there is no material fact in dispute, "we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

In determining whether the trial judge correctly interpreted the law, we begin by "identifying the elements of the cause of action and the standard of proof governing th[e] claim." Bhagat v. Bhagat, 217 N.J. 22, 39 (2014). Turning to the substantive claims at issue in this appeal, the federal Civil Rights Act, 42 U.S.C. § 1983, provides a federal cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a

A-0999-22

"person who[ acts] under color of any statute, ordinance, regulation, custom, or usage, of any State."

Our state's analog to § 1983 is the NJCRA, which states in pertinent part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c).]

See also Harz v. Borough of Spring Lake, 234 N.J. 317, 330 (2018) (recognizing that the NJCRA is modeled after § 1983).

Thus, the NJCRA "applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws." Gormley v. Wood-El, 218 N.J. 72, 97 (2014). Both § 1983 and the NJCRA provide a "means of vindicating substantive rights and [are] not a source of rights" by themselves. Id. at 98.

Under 42 U.S.C. § 1985, to establish a claim for civil conspiracy, a plaintiff must prove

A-0999-22

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

[United Brotherhood of Carpenters & Joiners, Loc. 610 v. Scott, 463 U.S. 825, 828-29 (1983).]

Notably, allegations of a civil conspiracy must be pled with "factual specificity." Church of Human Potential, Inc. v. Vorsky, 636 F. Supp. 93, 95 (D.N.J. 1986). Pleadings that merely contain conclusory allegations are insufficient to satisfy the requirements of § 1985. See Hauptmann v. Wilentz, 570 F. Supp. 351, 391 (D.N.J. 1983).

CEPA prohibits an employer from taking "any retaliatory action against an employee" in certain circumstances. N.J.S.A. 34:19-3. For example, under N.J.S.A. 34:19-3(a)(1), an employee who "[d]iscloses[] or threatens to disclose" to a supervisor or a public body an employer's "activity, policy or practice" that the employee "reasonably believes" violates "a law, or a rule or regulation promulgated pursuant to law" is protected. CEPA also protects an employee who:

[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

(2) is fraudulent or criminal . . . ; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3(c)(1) to (3).]

To establish a prima facie claim under CEPA, a plaintiff must plead facts to show:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity described in [N.J.S.A. 34:19-3(a) or (c)];

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar v. McDevitt, 77 N.J. 451, 462 (2003)).]

To show an adverse employment action, plaintiff must plead that he was subject to "[r]etaliatory action," which "means the discharge, suspension or

18

demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). "Terms and conditions of employment 'refer[] to those matters which are the essence of the employment relationship,' and include further serious intrusions into the employment relationship beyond those solely affecting compensation and rank." Beasley v. Passaic Cnty., 377 N.J. Super. 585, 608 (App. Div. 2005) (alteration in original) (citation omitted) (quoting Twp. of W. Windsor v. Pub. Emp. Rels. Comm'n, 78 N.J. 98, 110 (1978)).

The phrase encompasses "length of the workday, increase or decrease of salaries, hours, and fringe benefits, physical arrangements and facilities, and promotional procedures." Ibid. (citations omitted). Retaliation under CEPA can also include "many separate . . . relatively minor instances of behavior directed against an employee that may not be actionable individually but . . . combine to make up a pattern of retaliatory conduct." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).

Applying these principles, we agree with the judge that summary judgment dismissal of plaintiff's complaint was warranted. Through both § 1983 and the NJCRA, plaintiff seeks to vindicate his constitutional rights to privacy and the free exercise of religion. Plaintiff first argues that defendants violated

his constitutional right to privacy when Fedorko called Pastor Taylor and informed him that plaintiff had been ordered to quarantine, even though plaintiff did not test positive for COVID.

Our Supreme Court has recognized that the right to privacy is "[g]rounded in the Fourteenth Amendment's concept of personal liberty," Doe v. Poritz, 142 N.J. 1, 77 (1995), protecting at least two different kinds of interests: "the individual interest in avoiding disclosure of personal matters," and "the interest in independence in making certain kinds of important decisions," id. at 77-78 (quoting Whalen v. Roe, 429 U.S. 589, 599-600 (1977)).

As to the former, "the right of an individual to control access to his or her medical history is not absolute, [and] courts and legislatures have determined that public health or other public concerns may support access to facts an individual might otherwise choose to withhold." United States v. Westinghouse Elec. Corp., 638 F.2d 570, 578 (1980). In assessing the state interest in public disclosure of information, our courts have looked to the following factors for guidance:

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need

20

for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

[Doe, 142 N.J. at 88 (quoting Faison v. Parker, 823 F. Supp. 1198, 1201 (E.D. Pa. 1993)).]

See also Piscitelli v. City of Garfield Zoning Bd. of Adjustment, 237 N.J. 333, 361 (2019) (applying the factors in the context of disclosing public officials' private information).

Notably, while our State Constitution extends due process protection to personal reputation, we have clarified that "this does not mean that a liberty interest is implicated anytime a governmental agency transmits information that may impugn a person's reputation." In re L.R., 321 N.J. Super. 444, 460, (App. Div. 1999).

Here, plaintiff's claim that Fedorko violated his constitutional right to privacy when he disclosed plaintiff's quarantine status to Pastor Taylor is unavailing. Fedorko's disclosure to Pastor Taylor occurred on April 10, 2020, in the context of a public health emergency, where COVID-19 "created an immediate and ongoing public health emergency that require[d] swift action to protect not only the City's employees, but the public they [were] hired to serve. Tens of thousands of people [were] sickened each day in our country. Hundreds

21

[were] dying each day." In re City of Newark, 469 N.J. Super. 366, 385 (App. Div. 2021).

It is undisputed that plaintiff was directed to quarantine on April 5, 2020, when he participated in the church service. Fedorko testified that when he discovered that plaintiff had violated the quarantine, he was concerned that plaintiff could "get everyone in . . . the church sick." "Given the scientifically undisputed risk of spreading this deadly virus," defendants' interest in protecting the public health from potential exposure to COVID-19 outweighed plaintiff's privacy interest in his quarantine status. Id. at 386; see Westinghouse Elec. Corp., 638 F.2d at 578.

Moreover, plaintiff's reliance on In re Request to Modify Prison Sentences, 242 N.J. 357 (2020), is misguided. In that case, our Supreme Court ordered the Department of Correction to seal lists of inmates eligible for emergency medical home confinement during the COVID-19 outbreak as many of the inmates on the list had underlying medical conditions. Id. at 372-73, 387-89. There, the Court was addressing "potential concern under the Health Insurance Portability and Accountability Act of 1996 (HIPPA)," 45 C.F.R. § 164.512(e)(1)(i), an issue that plaintiff has not raised here. In re Request, 242 N.J. at 389.

Next, plaintiff argues defendants violated his constitutional right to the free exercise of religion when Fedorko, "acting in his official capacity," "damaged the relationship" between plaintiff and his pastor by "specifically identifying [plaintiff] as a person who broke a mandatory quarantine to attend a religious event."

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Emp. Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 877 (1990). Under the First Amendment, applicable to the States through the Fourteenth Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I; McKelvey v. Pierce, 173 N.J. 26, 39 (2002).

The Free Exercise Clause "protects religious freedom by 'embrac[ing] two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.'" McKelvey, 174 N.J. at 40 (alteration in original) (quoting Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940)). As such, "'[f]reedom to practice one's religion must be considered in light of the general public welfare.'" Bd. of Educ. v. Maas, 56 N.J. Super. 245, 268 (App.

Div. 1959) (quoting McBride v. McCorkle, 44 N.J. Super. 468, 479 (App. Div. 1957)) (recognizing that "'decisions upholding curtailment of the free exercise of religion shows that they involved situations where the court found the restriction reasonably necessary to protect some paramount societal interest.'" (quoting McBride, 44 N.J. Super at 479)). Thus, "[a] party challenging state action as violative of free-exercise rights must establish that the action produces a coercive effect on the practice of religion." F.G. v. MacDonell, 150 N.J. 550, 559 (1997).

Here, even when viewed in the light most favorable to plaintiff, the record is devoid of evidence indicating that Fedorko's disclosure of plaintiff's quarantine status to Pastor Taylor had a "coercive effect" on plaintiff's religious practice. "To defeat a motion for summary judgment, the opponent must 'come forward with evidence' that creates a genuine issue of material fact." Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012) (internal quotation marks omitted)). "Bare conclusory assertions, without factual support in the record, will not defeat a meritorious application for summary judgment." Horizon Blue Cross Blue Shield, 425 N.J. Super. at 32 (citing Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div.

24

1999)); accord Puder v. Buechel, 183 N.J. 428, 440-41 (2005) ("[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the [summary judgment] motion."); Oakley v. Wianecki, 345 N.J. Super. 194, 201 (App. Div. 2001) ("[U]nsubstantiated inferences and feelings" are insufficient to defeat a motion for summary judgment).

At his deposition, plaintiff testified that defendants' actions "changed [his] whole religious belief" and his "whole outlook on church." He claimed defendants "ruined the relationship" he had had with Pastor Taylor "for the last [twenty-eight] years." He testified that since receiving Pastor Taylor's text message, he had not "watched on[e] sermon that Pastor Taylor ha[d] given[] in over a year and a half" and had not attended church with his family. Additionally, plaintiff had not spoken to Pastor Taylor since April 2020, and had made no attempt to reach out and reconcile their relationship.

However, plaintiff acknowledged that since the April 2020 incident, he had not been "barred" from church, nor had he ever received any "texts or messages [from Pastor Taylor] . . . saying [he was not] welcome at the church" or that Pastor Taylor "did[ not] want [plaintiff] to preach there anymore." On the contrary, plaintiff delivered an online sermon to the church in February 2021, and attended a baptism in the summer of 2021. Notably missing from the

A-0999-22

record is any evidence that defendants have prevented, interfered, or otherwise burdened plaintiff's religious practice. Rather, the record undisputedly shows that plaintiff has chosen to change his religious practices of his own volition after receiving Pastor Taylor's text message. Therefore, the judge properly dismissed plaintiff's constitutional claims because plaintiff did not assert facts sufficient to establish a constitutional violation under § 1983 or the NJCRA as a matter of law.

Plaintiff further argues that defendants "acted in concert to deprive [him] of his [c]onstitutional rights and retaliate against" him because of his "subsequent complaints to OSHA," his role as "union shop steward," and his "litigation history with [d]efendants." Plaintiff asserts defendants "acted out of malice" when Trumpet "went out of her way to report [plaintiff's] attendance at the [service]" or when "Fedorko took it upon himself to humiliate [plaintiff] in front of his pastor and parishioners by singling [him] out." Once again, a review of the record reveals not a shred of evidence to support plaintiff's civil conspiracy claim. "Neither fanciful arguments nor disputes as to irrelevant facts will make an issue such as will bar a summary decision." Merchs. Express Money Ord. Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005).

Finally, plaintiff argues that because he was engaged in whistle-blowing

A-0999-22

activity, defendants retaliated against him and subjected him to adverse employment actions in violation of CEPA. Plaintiff contends that defendants contacted Pastor Taylor because they wanted to retaliate against him for his role as a union shop steward, his prior litigation history with defendants, his March 2020 correspondence, wherein he expressed COVID-related concerns, and his subsequent complaints to OSHA, which complaints were submitted after plaintiff filed suit. In further support of his CEPA claim, plaintiff includes two letters from 2018, wherein plaintiff voiced complaints relating to DPW's management. Plaintiff argues he was admonished for his complaints, forced to quarantine, and reported for attending a religious service when he was "under a fallacious mandatory quarantine order."

Plaintiff has not established a prima facie claim under CEPA because he has not suffered an adverse employment action. In his deposition, plaintiff acknowledged that during his quarantine, he was still paid his salary and he did not lose any promotional opportunities. He testified that he has never been "disciplined," "docked pay" or vacation time, "punished," or "suspended." During oral argument, plaintiff's counsel conceded that plaintiff did not receive any "adverse employment actions." Nonetheless, counsel urged that plaintiff's "relationship with his religious leader was ruined." While unfortunate, such an

allegation does not constitute the requisite adverse employment action in the terms and conditions of employment required under CEPA. Further, contrary to plaintiff's assertion that "no other DPW employees who [came] into direct contact with [COVID-positive employees]" were "ordered to self-quarantine," Fedorko testified that anyone who was a close contact to a positive patient was notified that "they had to be quarantined," and "should[ not] . . . be[] at work." In any event, a quarantine order in these circumstances can hardly be considered an adverse employment action.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0999-22